Daisy M. WHITEHILL, et al.,
Respondents,

v.

SEAWAY PORT AUTHORITY OF DU-
LUTH, MINNESOTA, Respondent,

and

First National Bank of Columbus,
Wisconsin, objector, Appellant.

No. C3–83–1609.

Court of Appeals of Minnesota.

May 29, 1984.

Thomas V. Firth, Thomas V. Firth, Ltd., David L. Black, Stacker & Ravich, Minneapolis, for respondent Whitehill.

Robert C. Maki and James R. Paulson, Halvorson, Watters, Bye, Downs & Maki, Ltd., Duluth, for respondent Seaway Port Authority of Duluth, Minn.

John N. Nys and Joseph J. Roby, Jr., Johnson, Fredin, Killen, Thibodeau & Seiler, P.A., Duluth, for appellant.

Heard, considered and decided by POPOVICH, C.J., and FORSBERG and RANDALL, JJ.

## OPINION

POPOVICH, Chief Judge.

This is an appeal from an order directing that monies remaining in a Bond Fund resulting from the sale of a facility financed by industrial development revenue bonds, after default by the tenant, should be paid out pro rata to all bondholders based on accrued interest. Appellant, First National Bank of Columbus (First National), owns the earliest-maturing bonds in the series, and claims the principal on these bonds should have been paid. We reverse.

## FACTS

The facts have been stipulated by the parties. Respondent Seaway Port Authority of Duluth (Authority) issued $1,585,000 industrial development revenue bonds in 1973 for construction of a malic acid plant to be leased by International Organics, Inc. *See,* Municipal Industrial Development Act, Minn.Stat. § 474.01 *et seq.* (1973). A Bond Resolution was adopted by the Authority in April, 1973, which called for a total of 317 bonds, $5,000 each, numbered serially and maturing annually in various amounts in the order of their serial numbers, from June 1, 1976–June 1, 2003. First National owned the first four bonds, which matured on June 1, 1976.

Interest and principal on the bonds were to be paid from a Revenue Bond Fund consisting principally of the lease rentals paid by the tenant. Interest was capitalized at $195,000. A Reserve Fund of $152,000 was also created. The bond issue was designed so that rentals paid by the tenant would always be sufficient to pay the bond interest and the principal of maturing bonds when due. The Authority did not assume a general obligation to repay the bondholders nor pledge any other assets to their repayment.

The tenant, International Organics, signed a Guaranty Agreement with the Authority acknowledging absolute liability for the payment of the revenue bonds. By the terms of the Lease the tenant was also required to make good any deficiency in the rentals to pay bondholders. *See,* Lease § 4.02. The tenant, however, unable to complete the facility with the financing available, defaulted in late 1974 and made no rental payments.

Sufficient funds existed in the Bond Fund, and the Reserve Fund, to pay all interest payments due until June 1, 1976, the date that First National's first bonds matured. At that time, the Authority paid the remaining funds pro rata to all bondholders based on accrued interest, leaving no funds to pay principal on the maturing bonds. The parties agree that this payout was in accord with the "Priority of Payment" provision, Section 5–7 of the Bond Resolution.

The Authority was able to sell the facility before the next semi-annual payment of interest came due, on December 1, 1976. The balance remaining from sale of the plant, after deducting expenses, was far short of the amount required to pay off all bondholders, but was sufficient to pay the accrued interest then due plus the principal on First National's then-matured bonds.

The Bond Resolution provides that funds from a sale of the facility are to be pledged to repayment of the bondholders, and are

assigned to the Revenue Bond Fund, from which the semiannual interest and yearly principal payments are to be made. Sections 5–1(6), 5–4(1)(F). The "Priority of Payment" provision reads as follows:

"All Bonds issued hereunder and secured hereby shall be equally and ratably secured by and payable from the Bond Fund, without priority of one Bond over any other, except as expressly provided herein. In the event that the balance in the Bond Fund is at any time insufficient to pay all principal and interest then due on Bonds payable therefrom, it shall be used first to pay pro rata the interest then due on all such Bonds, and any remaining balance shall be applied toward the payment of principal of the then matured Bonds in order of their maturity dates, and in order of the dates of issue of Bonds maturing on the same date . . . ."

Section 5–7.

## ISSUE

Was the trial court's order of pro rata distribution contrary to the terms of the Bond Resolution?

## ANALYSIS

A bond is a contract, *Connell v. Bauer,* 240 Minn. 280, 295, 61 N.W.2d 177, 186 (1953), which must be construed so as to carry out the intentions of the parties. *Midway Center Associates v. Midway Center, Inc.,* 306 Minn. 352, 356, 237 N.W.2d 76, 78 (1975). Where there is no ambiguity in the instrument, there is no room for construction by the court. *Starr v. Starr,* 312 Minn. 561, 562–63, 251 N.W.2d 341, 342 (1977). Whether a contract is ambiguous is a question of law, in the first instance. *Blattner v. Forster,* 322 N.W.2d 319, 321 (Minn.1982).

The revenue bonds issued by the Authority were issued pursuant to the Municipal Industrial Development Act, Minn.Stat. § 474.01 *et seq.* (1973), and provisions concerning public indebtedness in general, Minn.Stat. § 475.51 *et seq.* (1973). These statutes leave the manner of payment from funds received from sale of a facility to local ordinance or individual bond resolutions. Minn.Stat. § 474.09(7), (16) (1973).

The arguments of the parties on appeal center on the "Priority of Payment" provision in the Bond Resolution, Section 5–7. This section consists of separate and contrasting provisions for (1) equality of security, and (2) priority of payment. Construing the Bond Resolution as a whole and the supporting documents, as we are required to do, *see, e.g., Telex Corp. v. Data Products Corp.,* 271 Minn. 288, 293, 135 N.W.2d 681, 685 (1965), we do not find the terms of the contract to be ambiguous.

The Resolution required that proceeds received from sale of the Project were to be pledged and assigned to the Revenue Bond Fund. See 5–1(6). For the disbursement of that Fund, the following provision was made:

". . . money in the Bond Fund shall be used and withdrawn by the AUTHORITY solely to pay the interest on the Bonds as they become due and payable . . .; to pay the principal amount of the Bonds at their respective stated maturities; or to redeem and prepay Bonds . . . ."

Section 5–4(1). By the terms of this provision, the Authority was required to and did deposit the sale proceeds in the Bond Fund.

When the first payment date arrived following sale of the facility, Section 5–7 required the Authority to pay out these sums in the priority specified, but only if "the balance in the Bond Fund is . . . insufficient to pay all principal and interest then due." The balance in the Bond Fund was then $123,250.80. The payments due at that time were only $100,155.42. The balance was, therefore, not insufficient to make all principal payments remaining. The Authority, however, realizing the Fund would be exhausted by the next payment date, claimed a *prospective* insufficiency in the Fund and invoked Section 5–7. The funds have been escrowed and earning interest pending conclusion of this litigation.

Thus, the Bond and the Bond Resolution, which formed the contract between the Authority and the bondholders, required the Authority to pay out of the Bond Fund, which included proceeds from sale of the Project, the principal due on First National's matured bonds. Since there was no insufficiency in the Bond Fund on December 1, 1976, Section 5–7 could not be invoked.

 Even if Section 5–7 was applicable, its provision for equality of security among all bondholders would not apply to the proceeds from sale of the project. The security furnished to the bondholders was in the tenant's guaranty agreement with the Authority in which the tenant acknowledged absolute liability for the payment of the revenue bonds. The agreement gave the bondholders and the Authority the right to enforce the terms of the agreement. The lease also made the tenant liable for any deficiencies in payment to the bondholders, in the following terms:

"If on any date the balance in the Bond Fund is not sufficient [to make payments on the Bonds], the Tenant will forthwith pay the deficiency."

Section 4.02.

Although the proceeds of a sale of the facility were pledged to payment of the bondholders, Bond Resolution Sec. 5–1(6), they did not thereby become "security" for partial repayment on all bonds not yet matured. Rather, as with lease rentals, these funds were assigned to the Bond Fund for payment of principal and interest becoming due. If intended as "security," the proceeds from the sale would not have been assigned to make these scheduled payments. Read as a whole, the documents indicate that it was the Authority's interest in the Lease, and not its interest in the real property, which was the bondholders' security. Had the Authority and bond purchaser wanted the proceeds from the sale of the facility prorated among all bondholders whether bonds had matured or not, rather than deposited in the Bond Fund, the Resolution could have provided for this alternative. It did not.

 A contract is ambiguous only if, judged by its language alone, it is reasonably susceptible of more than one interpretation. *Metro Office Parks Co. v. Control Data Corp.*, 295 Minn. 348, 351, 205 N.W.2d 121, 123 (1973). The Bond Resolution and supporting documents unambiguously gave First National a right to payment of the principal on its matured bonds on December 1, 1976.

 The Fund has accumulated considerable interest since December, 1976. The Fund, however, would have become insufficient in June of 1977, but for the ensuing litigation. Accordingly, the priority provision in Section 5–7 should be applied to the distribution as of that date. Distribution would then be in the following order:

1) unpaid interest due on June 1, 1976;

2) matured bonds due on June 1, 1976;

3) interest due on December 1, 1976;

4) interest due on June 1, 1977;

5) principal due on June 1, 1977;

6) interest due on December 1, 1977;

7) ... etc., until depletion of the Bond Fund.

## DECISION

The Bond Resolution required that the proceeds of sale of the facility be used to make scheduled interest and principal payments. The principal due on the June 1, 1976 matured bonds owned by appellant shall be paid after interest due June 1, 1976 on all bonds is paid. The order of the trial court is reversed.

Reversed.