THE 2416 CORPORATION, Indiv. and as Representative of the Class of Holders of University of Illinois Auxiliary Facilities System Revenue Bonds, Plaintiff-Appellant, v. BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, Defendant-Appellee.

First District (4th Division)   No. 1—89—3535

Opinion filed January 31, 1991.

DeWolfe, Poynton & Stevens, of Chicago (John D. DeWolfe, Jr., and Richard James Stevens, of counsel), for appellant.

Chapman & Cutler, of Chicago (James E. Spiotto, James R. Richardson, Ann Acker, Wendy A. Grossman, and Ellen L. Karecki, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

Plaintiff, The 2416 Corporation, filed this lawsuit as a class action against the board of trustees of the University of Illinois (Trustees). As a holder of certain municipal revenue bonds issued by the Trustees, plaintiff seeks to compel the Trustees to purchase the bonds from plaintiff's class, on the same terms as the Trustees purchased similar bonds from the Department of Education (DOE). In essence, plaintiff contends that the Trustees gave an improper preference or priority to DOE, in violation of the obligations embodied in the bond instruments.

The trial court entered summary judgment in favor of the Trustees, rejecting plaintiff's construction of the terms of the bonds and finding that the university had not violated any contractual obligations. The court ruled that the Trustees' redemption of certain series of bonds within the optional redemption period, for less than the face value of the bonds, did not constitute a preference or priority and neither harmed nor affected holders of other series of bonds.

On appeal, plaintiff's main arguments are that (1) the university was not authorized by law to take any action that would cause the defeasance of plaintiff's bonds and (2) the Trustees' purchase of the DOE bonds was a prohibited preference or priority granted to one bondholder over plaintiff's class of bondholders. Plaintiff also challenges the classification of the transaction between the university and DOE as a redemption, asserting that the requirements for a redemption were not satisfied.

We affirm.

Background

The University of Illinois (University) is authorized by State law to borrow money and issue and sell bonds for the purpose of acquiring, constructing, or improving its facilities and to refund or refinance its bonds. (Ill. Rev. Stat. 1987, ch. 144, par. 48.1F.) The University of Illi-

nois Revenue Bond Financing Act for Auxiliary Facilities (Bond Act) (Ill. Rev. Stat. 1987, ch. 144, par. 48.1 *et seq.*) also allows the University to refund and refinance any outstanding bonds by issuing "refunding" bonds that are secured by and payable from the same source as the bonds being refunded. Ill. Rev. Stat. 1987, ch. 144, par. 48.5.

The bonds in issue are revenue bonds, which are payable from a. specific source of revenue, rather than bonds of indebtedness. The latter type of bonds are issued by States and governmental units, and are payable from and secured by a pledge of the issuer's taxing power. Generally, revenue bonds are payable from the income of the projects that are built using the proceeds of the bond issues.

THE 1963 BOND ISSUE

In 1963, pursuant to resolution, the University issued $6.8 million of tax-exempt Congress Circle Union Bonds, Series A (1963 Bonds), pursuant to a resolution. The proceeds of these bonds, together with the proceeds of $4 million in Congress Circle Union Bonds, Series B, were used to construct a union building and parking facilities for the Congress Circle Campus in Chicago. Payment of all bonds issued pursuant to the 1963 resolution was secured by revenues to be derived from (1) the operation of the completed facilities; (2) the operation of any other revenue-producing facilities for which additional bonds might be issued subsequently; and (3) certain student service charges.

The 1963 Bonds were serial bonds, which means that the aggregate principal amount of $6.8 million was divided up in such a way that portions of the principal were scheduled to mature over the course of several years (in this case, from 1969 through 1993). These bonds also carried an obligation on the part of the University to refrain from redeeming the bonds before April 1, 1971, thereby ensuring that the bondholders would receive the (then) high rate of interest for a minimum of almost eight years. This feature is known as "call protection" and is considered to be beneficial to the holder of the bond.

In return for the University's granting call protection for the fixed period, the bond contract allowed the University to redeem some or all of the 1963 Bonds after that fixed time. This is also a common provision, known as "optional redemption" or "optional call," which allows the issuer to redeem bonds before they mature. In the pending case, under the 1963 resolution, the University could redeem the 1963 Bonds from surplus monies in the Congress Circle Bond Fund beginning on April 1, 1971. The University could also exercise its optional redemption using general revenues, subject to some limitations, beginning on April 1, 1973.

If the University decided to redeem any of the 1963 Bonds prior to maturity, its bond contract required it to pay the holders of the bonds to be redeemed a premium amount, in excess of the face value of the bonds.

THE 1965 BONDS

The University issued $9.5 million of tax-exempt Housing Revenue Bonds of 1965, Series A (1965 Bonds) to construct dormitories and staff housing. The 1965 Bonds were issued pursuant to a resolution that supplemented and amended a 1958 housing revenue bond resolution. For the 1965 Bonds, maturity dates range from 1967 through 2001.

These bonds were secured by revenues to be derived from (1) the operation of the dormitory and staff housing facilities that were completed from the 1965 Bond proceeds and all other bonds issued pursuant to the housing bond resolution; (2) a defined portion of student tuitions; and (3) certain existing revenue-producing buildings of the University, after payment of other indebtedness.

The 1963 Bonds and the 1965 Bonds were payable from and had liens on separate sources of revenues. Plaintiff owns one each of such bonds. Plaintiff's 1963 Bond, series A, has a $5,000 face value and bears interest at the rate of 3.5%. It matures on October 1, 1991. The 1965 Bond, series A, has a $10,000 face value and bears interest at the rate of 3.7%, maturing on October 1, 2000.

THE REFUNDING BONDS (1978 SERIES A THROUGH M BONDS)

In 1978, for financial reasons, the University decided to combine several of its separate, revenue-producing enterprises into one, unified system. At that time, the 1963 and 1965 Bonds, as well as others, were each payable from different sources of revenue. Pursuant to a 1978 resolution, the University issued almost $64 million in "Auxiliary Facilities System Revenue Bonds Series A through M," which combined the separate revenue systems.

At the time, the United States Department of Housing and Urban Development owned 12 separate series of bonds issued by the University, with an aggregate face value of $20,074,000. Pursuant to the 1978 resolution, the University issued series A through L bonds to replace HUD's outstanding bonds from the prior, separate series. The series A through L bonds were issued as "refunding bonds" and bore the same aggregate face value as did the original bonds, which were being exchanged for the 1978 series. As refunding bonds are issued to refinance an outstanding issue, they do not create a new obligation but are considered to be an extension of the obligation of the original bonds. These

"exchange refunded" bonds were returned to the University to be cancelled and destroyed.

The series M bonds from the 1978 refinancing were issued and sold to the public, for approximately $44 million. The University used a portion of the proceeds to establish a debt service reserve for the series M bonds and another portion to acquire revenue-producing athletic and recreational facilities. The balance of almost $33 million from the sale of the series M bonds was used to purchase United States Treasury bonds and notes to fund an escrow account from which the University would pay principal and interest obligations on various bonds that were then outstanding, including the 1963 and 1965 Bonds, either during their optional redemption periods or at maturity.

This 1978 "advance refunding" of outstanding bonds prompted rating agencies to upgrade the rating of the bonds to the most risk-free investments on the market. Such upgrading resulted from the deposit of United States government securities to replace the original collateral (housing revenue accounts) that had been pledged to secure payment when the bonds were originally issued. Advance refunding apparently is a normal and accepted practice in the municipal bond industry.

The parties disagree as to whether the 1978 advance refunding caused a defeasance, or discharge, of virtually all of the University's contractual obligations under the originally issued bonds that were exchanged for the 1978 refunded bonds. No one denies, however, that the University's obligation to pay timely interest and principal remained inviolate.

Shortly before the pending litigation began, plaintiff purchased one of the advance refunded bonds, series M, in the face amount of $25,000. This bond bears interest at the annual rate of 6⅞%. As the trial court noted, plaintiff corporation's president admitted in his deposition that the purchase of this bond (on the advice of counsel) was an attempt to acquire standing to challenge the validity of the 1984 transaction between the University and DOE.

All of the series A through M bonds are secured by the same collateral and are therefore considered to be in "parity." Parity bonds share a priority of claim or lien against particular pledge revenues. In the event the pledged revenues become insufficient to pay the entire bond obligations secured thereby, all holders of parity bonds or series of parity bonds would share equally in the shortfall; no one bondholder or series could be given a priority or preference of payment over the others.

All of the bonds issued by the Trustees contain a covenant that governs modification or amendment of the rights and obligations of the University and the bondholders. Under the covenant, the Trustees are pro-

hibited from creating "any preference or priority of any bond or bonds over any other bond or bonds or coupon or coupons over any other coupon or coupons."

The following provision appears only in the government's series A through L bonds:

"[T]he Board upon giving at least thirty (30) days notice, shall have the option to prepay, on any interest payment date, the entire unpaid principal amount hereof, or, from time to time, in the inverse order of the aforesaid principal installments, such lesser portion thereof in multiples of Five Thousand Dollars ($5,000) *** with interest thereon to the date of such prepayment."

Under the contractual provisions of the series A through L bonds, the University had the right to redeem, at its sole option, some, none, or all of the series of A through L bonds any time on or after October 1, 1978. The series M bonds sold to the public, in contrast, could not be redeemed until April 1988.

THE 1984 REDEMPTION OR REPURCHASE OF THE DOE BONDS

Between 1978 and 1984, HUD transferred ownership of each of its series A through L bonds to DOE. In September 1984, the University exercised its optional redemption right for all of the outstanding A through L bonds. The series M bonds were still under call protection at that time. DOE, holder of the bonds that were to be redeemed, waived its contractual right to receive the 1.5% premium that it was entitled to receive under the 1978 resolution. Moreover, as part of a Federal college housing loan discount program, DOE agreed to accept in full payment and satisfaction 58% of the outstanding principal amount of the series A through L bonds. The calculated present value or purchase price of the bonds as of September 27, 1984, was almost $17 million, a figure that includes the early redemption premium amount. Because DOE agreed to accept $7.3 million less than the full amount to which it was entitled, as a means of conferring a gift upon the University pursuant to the college housing loan discount program, the University was able to retire the A through L bonds by paying just under $9.7 million on an obligation of approximately $17 million.

Concurrent with the 1984 redemption, the University approved issuance of approximately $55 million in bonds (Series 1984 Bonds), and used a portion of the proceeds of that series, together with the United States securities and cash on deposit in the 1978 escrow, to fund a new escrow. The 1984 escrow provides for payment of all of the 1978 advance refunded bonds that were still outstanding (including plaintiff's 1963 and 1965 Bonds) and the series M bonds, all of which were out-

standing at that time. As principal becomes due on those bonds, it is paid from the 1984 escrow. Because of the 1984 escrow, Moody's Investors Service upgraded its rating of the series M bonds from A1 to Aaa, the highest rating that Moody's assigns. Standard & Poor's also increased its rating of the series M bonds from AA to AAA, its highest rating.

The trial court expressly found that none of the bond documents were amended or modified in violation of any bondholder's rights and that the relevant transactions were carried out pursuant to the original terms of each bond issue. The court held that the University's actions were "well within its contractual and statutory grant of authority."

It is undisputed that the University has paid all principal and interest due on all bonds pursuant to schedule and that there has been no default in payment. Plaintiff's position, however, is that the Trustees' 1984 retirement of the DOE series A through L bonds constituted an unauthorized "sale" rather than a redemption and was a preference or priority accorded to DOE over other members of plaintiff's class.

OPINION

While we do not profess to grasp all aspects of municipal bond law, we have found that the controversy before us ultimately comes down to simple contract principles. In brief, we are called upon to decide whether the University violated plaintiff's contract rights under the pertinent bond covenants when the University purchased or redeemed DOE's series A through L series bonds and failed to give plaintiff's class the same opportunity to sell its bonds.

I

The heart of this argument centers on a covenant contained in all of the bonds issued by the University, to the effect that the University may not show a "preference or priority" to any bond over any other. By giving the phrase the broadest possible meaning, plaintiff argues that the 1984 transaction between DOE and the University was a prohibited preference because it allowed one bondholder, DOE, to sell its bonds off early (albeit at a substantial discount). As a result, plaintiff concludes, the plaintiff class of bondholders was financially harmed because its class members could not sell their own bonds and free up their money for reinvestment at higher interest rates.

Plaintiff first argues that the "no preference" covenants in its bonds were *not* defeased (defeated) by the 1978 advance refunding in which the series A through M bonds were issued. All covenants contained in plaintiff's bonds were, by law, carried over into the refunding bonds. In

support, plaintiff cites to a section of the statute that authorizes the Trustees to issue refunding bonds. See Ill. Rev. Stat. 1987, ch. 144, par. 48.5a ("All of the provisions of this Act, including covenants that may be entered into in connection with the issuance of bonds, shall be applicable to the authorization and issuance of any refunding bonds").

This contention, however, is not in dispute on appeal because the University has conceded that the prohibition against preferences or priorities of *payment* is a right that cannot be defeased. Simply put, defeasance in this context means that all contractual rights and obligations contained in the original, outstanding bonds are extinguished by the issuance of United States government-secured refunding bonds, *except* the bondholders' right to be paid timely interest and principal from the established escrow. (See *Morton Arboretum v. Thompson* (N.D. Ill. 1985), 605 F. Supp. 486, 490) (bondholders' fundamental right is to have both principal and interest paid when due) (statutory defeasance under Illinois State Tollway Authority Act). According to the Dow Jones-Irwin Guide to Municipal Bonds (1987), page 52, refunding municipal bonds nullifies earlier covenants, primarily related to the security of the bonds, because the bonds are deemed to have been paid once they are refunded; they cease to exist on the books of the issuing jurisdiction. This result is logical because the escrow of Federal government-backed obligations is considered premier security for payment of the outstanding bonds. Therefore, the purpose of any other contractual covenants that might have imposed restrictions on the issuer's ability to deal with the original collateral would become obsolete.

In our opinion, the meaning and scope of defeasance is not an issue material to the disposition of this appeal. Accordingly, we move on to the central issue: Did the trial court err in deciding that the University had not given DOE a preference or priority, as those terms are commonly understood in bond parlance?

Plaintiff apparently argues that *any* differential treatment, such as that which occurred here, may be a prohibited preference or priority. The University, on the other hand, maintains that the prohibition against preferences and priorities refers solely to the situation in which the revenues pledged to secure multiple series of parity bonds become depleted and there are insufficient funds to service the debt represented by all such bonds. In such a case, the law does not permit some of the affected bondholders to recover in full while others are left with worthless bonds and no recourse to obtain repayment of the shortfall. In case of a shortfall, the available revenues are to be prorated so that all bondholders share equally. See Moody's Investors Service, *Moody's on Mu-*

*nicipals* 72 (1987); *Maccabees v. City of Ashland* (1937), 270 Ky. 86, 109 S.W.2d 29; *Moore v. Howard* (1933), 227 Ala. 219, 149 So. 249.

Plaintiff maintains that the Trustees gave both a preference and a priority to DOE when they purchased all $16.7 million of the series A through L bonds at a calculated price before the bonds were due. According to plaintiff, this action was a "preference" because it gave DOE an opportunity which no other bondholder had and it was a "priority" because it was a purchase before the Trustees had purchased or had an obligation to pay the other outstanding bonds, such as the ones held by plaintiff.

In support of its position, plaintiff cites several cases in which courts held that payment to one bondholder constituted an improper preference. The University argues that these same cases are entirely consistent with its position and do not provide authority for plaintiff's theory.

In *Rothschild v. Village of Calumet Park* (1932), 350 Ill. 330, 183 N.E. 337, the plaintiff owned certain special assessment bonds and sought an accounting after his bonds became past due and unpaid. The municipality argued that it had a duty to use the special assessment revenues it had collected to retire in full as many bonds as it was able to pay, instead of prorating the collection among bondholders. The court held that the special assessment collections were the only source of payment for the bonds and therefore such collections became a trust fund for payment of the bonds to all holders, "without preference among them." (350 Ill. at 339, 183 N.E. at 341.) The court noted that if for any reason there is a deficiency in the collections of an installment, equity requires that the loss shall be borne ratably by each bondholder.

Two other cases that plaintiff cites relied on the *Rothschild* holding and arrived at similar conclusions on the preference issue. In *Michael J. Bransfield & Sons, Inc. v. City of Chicago* (1950), 342 Ill. App. 206, 96 N.E.2d 386, and *Loewenthal Securities Co. v. City of Chicago* (1951), 343 Ill. App. 159, 98 N.E.2d 541, the City of Chicago appealed from writs of *mandamus* directing it to pay monies it had collected on special assessment bond issues to fewer than all holders of the bonds. Both courts rejected the position that bondholders could be paid on a first-come-first-served basis when the collected funds would not be sufficient to pay all bondholders. Citing the principle of *Rothschild*, the courts held that all holders of past-due special assessment bonds had equal rights in the collateral and were entitled to pro rata distribution therefrom.

The above three cases support the University's definition of what a "preference" is and under what circumstances it usually arises in the municipal bond field. Furthermore, unlike plaintiff, the University ob-

tained an expert's affidavit to explain the usage of these terms of art. According to him:

> " 'Preferences' or 'priorities' refer to situations in which revenues pledged to secure repayment of more than one series of parity bonds are either seriously depleted or exhausted in order to repay some, but not all, such parity bonds, thereby short-changing certain series of bonds. In other words, if there is a shortfall in revenues available to repay all debt service obligations, the prohibition against preferences and priorities requires that all parity bonds share in that shortfall. *Absent a shortfall, the terms 'preference' and 'priority' are meaningless.*" (Emphasis added.)

Bankruptcy law also recognizes the concept of allowing creditors and classes of creditors to share pro rata in the distribution of the bankruptcy estate. (See 11 U.S.C. §547(b)(1988); *In re George Rodman, Inc.* (10th Cir. 1986), 792 F.2d 125, 127.) A debtor's transfer of assets to some creditors or actual payment to some creditors within a certain period before the filing of a bankruptcy petition is therefore deemed an unlawful preference that is subject to being set aside.

We are far less persuaded by plaintiff's position, which holds that the law prohibits the Trustees from undertaking *any* type of action or dealings with one group of bondholders that it does not engage in with others. Plaintiff cites no municipal bond cases to support its position and, instead, apparently takes a "plain meaning" approach to the "preference or priority" terminology used in the bonds.

Plaintiff argues that, since the covenant bars "*any* preference or priority of *any* bond or bonds over *any* other bond or bonds" (emphasis added), no further analysis is needed because it is obvious that "any" means that there is more than one type of preference that is prohibited. For example, plaintiff contends, it would be improper for the Trustees to purchase bonds from friends of the Trustees instead of on the open market. Similarly, it would be improper for the Trustees to redeem some bonds prior to their maturity but not other bonds.

■ Plaintiff's position ignores the authority that supports the University's construction of preference and priority. By focusing on general principles of contract construction to construe the term "any preference," plaintiff never adequately explains why this court should simply ignore the municipal bond treatises and other authorities that the University relies on for explaining the terms. (*E.g., Moody's Investors Service, Moody's on Municipals* 72 (1987); Moore, 227 Ala. 219, 149 So. 249; *Maccabees*, 270 Ky. 86, 109 S.W.2d 29.) The University's expert witness, Professor Robert Boyden Lamb, stated his opinion, as an authority in the municipal bond field, that the preference and priority language

*only* refers to the default situation in which the funds securing parity bonds are insufficient to pay all bondholders. Plaintiff did not obtain an expert witness to counter this construction or to support its own proposed application of the concept. Nor does plaintiff challenge the qualifications of the University's expert witness. Instead, plaintiff challenges some of the underlying assumptions of Lamb's opinion and further asserts that the trial court should have disregarded the expert's opinion on "the ultimate issue before the Court."

■■ We do not agree that the trial court should have ignored an expert's opinion on the meaning to be ascribed to terms of art in a specialized area of the law. It is true that the trial court was not bound by the professor's opinion. It is also true that courts of equity are especially suited to the task of construing contract or statutory language without expert help. Nevertheless, there are many situations in which plain meaning may be tempered by usage in a particular trade.

■■ We conclude that the trial court did not err in resolving the central issue of whether the 1984 DOE transaction constituted a prohibited preference or priority.

## II

Plaintiff challenges the validity of the University's September 27, 1984, transaction with DOE on another basis: Did the trial court err in characterizing the transaction as the University's "redemption" of the bonds when in fact it was a "private purchase"? Plaintiff argues that the bond documents do not authorize any such purchase. According to plaintiff, the Trustees could only purchase bonds on the open market, and even then, only under the circumstances set out in this provision of the 1958 housing bond resolution:

> "Any contract or agreement between the Board of Trustees and any original purchaser of Bonds may provide that any funds remaining in a Construction Fund Account established for the account of any series of Bonds being acquired by such purchaser be applied to (I) the redemption of such Bonds or other Bonds then subject to redemption, (II) the purchase of Bonds on the open market, or (III) the construction of additional facilities by the transfer of such funds to another Construction Fund Account *** ."

Plaintiff asserts that nothing in this resolution allows a "private" repurchase by the Trustees. Furthermore, plaintiff contends that to the extent the transaction was a redemption, the Trustees did not follow the attendant procedures, such as giving notice.

The Trustees respond that the economic effects of a redemption, prepayment, or repurchase of bonds for cancellation are virtually identical. In each case, before the maturity date of the bond, the obligor on the debt (the University) pays a price to the holders of the bonds in exchange for the surrender of the bonds for cancellation. Although plaintiff insists that a purchase is different from a redemption, plaintiff cites no supporting cases or municipal bond treatises that support the application of its theory to these facts.

■ Presumably, a purchase on the open market means a situation in which the University would pay a bondholder whatever the market value of the bond would be at the time of purchase. In that situation, the bond would not be cancelled, as in a redemption, but would be held by the University as any other investment paper. Plaintiff does not argue that the bonds in question were not cancelled. Instead, it alludes to a scenario in which preferential purchases may be set up for friends of the Trustees. In such a case, it would be improper for a private or secret sale to benefit one bondholder over another. We note that by definition, a secret or private sale would not be a sale on the open market, which anticipates an arm's length relationship between buyer and seller.

■ We cannot mold the facts of the pending case to fit the private purchase theory. Indeed, plaintiff does not, or cannot, marshal *facts* to demonstrate that the University's purchase or redemption of the DOE bonds was prohibited (expressly or in spirit) by the pertinent statutes or bond resolutions. Instead, plaintiff's challenge focuses on various technical reasons why the 1984 transaction between DOE and the University does not conform to the meaning of "redemption" as set out in the relevant bond documents or authorizing statute. Specifically, plaintiff contends that the 1984 transaction did not result in the payment of the principal amount of the bonds, because of the discount; DOE did not receive the fixed prematurity premium set out in the redemption provision; the transaction did not fulfill the requirement that payment be made on the "interest payment date" (October 1, 1984); and notice was not published in the newspaper.

■ While we note that the 1958 bond resolution does set forth such requirements for the redemption of bonds, we are at a loss to understand why DOE's apparent willingness to waive such formalities (and indeed take less than the full amount to which it was entitled under the bonds) is a matter that is appropriate for plaintiff to challenge. Even assuming that plaintiff has standing to challenge an otherwise valid transaction or redemption between the University and another series bondholder, we do not agree that a violation of the guidelines for redemption gives plaintiff any right or remedy in this context.

■■■ With respect to the notice argument, the University points out that because DOE was the owner of 100% of the series A through L Bonds, additional notice to it was redundant and unnecessary. (See *Geary v. Dominick's Finer Foods, Inc.* (1989), 129 Ill. 2d 389, 400, 544 N.E.2d 344 (parties are not required to perform futile acts); *Prairie Vista, Inc. v. Central Illinois Light Co.* (1976), 37 Ill. App. 3d 909, 912, 346 N.E.2d 72, 74.) The holders of *different* series of bonds, such as the series M bonds, were not entitled to notice of the redemption of the series A through L bonds because the notice provisions are for the benefit of the bondholders in the particular series of bonds in which some or all bonds are being redeemed.

Even if we agreed, moreover, that the University's failure to comply with the procedures for redeeming the A through L bonds gave plaintiff some remedy, this question remains, What relief would be appropriate?

■■■ The remedy that plaintiff seeks is the right to sell its bonds to the University before their maturity date, presumably at the premium amount above face value that is normally required when bonds are repurchased or redeemed by the University. Such relief would elevate plaintiff and the purported class of bondholders to a position far above DOE's, however. Under the terms of the redemption or repurchase of DOE's bonds, the University received a substantial discount on the price. Plaintiff has not suggested its willingness to match this discount by accepting 58% of the face value of its bonds.

■■■ In conclusion, we emphasize that each bond or series of bonds constitutes separate contracts between the bondholder and the University. These separate contracts contain different terms. For example, the series A through L bonds held by DOE contain an express provision allowing the University to redeem the bonds before their maturity, at the University's option. In 1984, when it exercised that option, the series M bonds were under call protection; they were expressly nonredeemable before 1988. Moreover, the rates of interest on the series A through L bonds ranged from 2¾% to 3⅝%, while the Series M bonds carried interest rates from 6¾% to 6⅞%. In addition, if the University elected to redeem the series M bonds after the period of call protection but before maturity, it was subject to paying a premium ranging from 1%to 3%, while the premium for early retirement of the series A through L series bonds was from 1% to 2%.

■■■ If we carried plaintiff's theories to their logical end, we would be endangering virtually all bond covenants that permit optional redemptions by the issuer and call protection for the bondholder. Such a result would not be well founded in contract law. The redemption of one series of bonds does not impair or even affect the contract rights of the

owners of other series of bonds. See *Ahlborn v. City of Hammond* (1953), 332 Ind. 12, 111 N.E.2d 70.

■■ It is not disputed that under the terms of its bond contracts with DOE the University had the absolute right, at its option, to redeem some, none, or all of the series A through L bonds after October 1, 1978. Plaintiff and other holders of series M bonds, or indeed the 1963 and 1965 Bonds (to the extent they have standing), have not sustained even a remote or speculative injury by the lawful actions of the University in its transaction with DOE. Therefore, plaintiff's attempt to remake the bond contract by forcing the University to redeem the plaintiff class' bonds before maturity must fail. While class action litigation of the sort contemplated here could result in a lot of fees for a few lawyers, we see little real benefit to anyone else and a real detriment to the ability of the University to govern its finances through issuance and redemption of its revenue bonds.

Our review of the trial court's extensive findings and conclusions supports the determination that plaintiff failed to establish a cognizable breach of contract. Since we have found no impropriety in the University's 1978 advance refunding and the 1984 transaction with DOE, we hold that plaintiff's contractual rights were in no way impaired. Accordingly, we affirm the trial court's entry of summary judgment in favor of the University.

Affirmed.

JIGANTI, P.J., and McMORROW, J., concur.