(836 P.2d 6)

No. 67,222

CITY OF CHANUTE, KANSAS, and BANK OF COMMERCE, CHANUTE, KANSAS, *Plaintiffs,* v. IRENE POLSON, individually and on behalf of the Class of Senior (Coupon) Bondholders, *Defendants-Appellants,* and JACK W. BROWN, CAROL F. BROWN, OPAL B. BROWN, EVA I. PARR, PAUL NELSON, PEARL NELSON and MAR-LENE SPENCE, the same being Registered Bondholders, *Defendants-Appellees,* and GRACE E. HUPP and ALPHA H. DALTON, also Registered Bondholders, *Defendants.*

Opinion filed June 19, 1992.

*Kurt F. Kluin,* of Chanute, for appellants.

*Edwin H. Bideau III,* of Chanute, for appellees.

Before ELLIOTT, P.J., PIERRON, J., and THEODORE B. ICE, District Judge, assigned.

PIERRON, J.: This is an appeal by coupon bondholders of industrial revenue bonds issued by the City of Chanute. The project defaulted and the proceeds from the property which secured the bonds are not sufficient to pay off all the bonds. The City and the fiscal agent, Bank of Commerce, filed a declaratory judgment action asking the court for guidance in distributing the proceeds among the bondholders. The district court ruled that proceeds should be distributed pro rata among coupon bondholders and registered bondholders. The coupon bondholders denoted as "first lien" have appealed that decision.

The City in 1983 issued $900,000 of industrial revenue bonds for the purchase of the land, buildings, and equipment of Neosho Paper Products, a corporation located in Chanute. The project was financed by the issuance of bonds and was to be repaid by

the new tenant of the facility, New Era Packaging, Inc., also known as New Neosho Paper Products. Unfortunately, New Neosho Paper Products defaulted in 1986. Some of the bonds had been paid in full.

The facility has grown to be increasingly worthless as the years have passed and economic conditions in Chanute have taken their toll. Apparently, the taxes owed on the facility are worth more than the facility itself. Still outstanding are $785,000 worth of bonds, of which $605,000 are coupon bonds and $180,000 are registered bonds. Also still due is interest on all of those bonds.

The registered bonds were issued to the owners of the old Neosho Paper Products in partial satisfaction of the sale price. No cash was paid by the registered bondholders for their bonds. The ordinance issued by the City describing the bond issuance makes a number of references to the bonds and to the details of their issuance. At issue are the ordinance's references to the coupon bonds as "first lien" bonds and the registered bonds as "junior lien" bonds.

Because the language of the ordinance and the lease agreement treats all bondholders on an equal footing regarding voting rights, compromise of any indebtedness, sale of the facility, and reduction of principal and interest due, the appellees contend that the references to the registered bonds as "junior lien" bonds does not indicate to the court what the priority payment should have been. The district court agreed with the appellees and found that payment should be scheduled on a pro rata basis.

The issue before us is whether the district court erred in determining that the bond ordinance made no provisions for priority of payment and, if so, whether the district court's decision that the proceeds should be distributed pro rata among the coupon bondholders and the registered bondholders should be reversed.

The standard of review on this question is that "[t]his court's review of conclusions of law is unlimited." *Hutchinson Nat'l Bank & Tr. Co. v. Brown*, 12 Kan. App. 2d 673, 674, 753 P.2d 1299, *rev. denied* 243 Kan. 778 (1988). The bonds at issue here were issued under the provisions of K.S.A. 12-1740 *et seq.* Unfortunately, the statute does not provide any guidance as to priority of payment for different classes of bonds if there is a default and

the property securing the bonds is not worth the principal and interest owned on the outstanding bonds.

The bonds at issue in this case are revenue bonds, payable from a specific source of revenue, rather than bonds of indebtedness. "The latter types of bonds are issued by States and governmental units, and are payable from and secured by a pledge of the issuer's taxing power. Generally, revenue bonds are payable from the income of the projects that are built using the proceeds of the bond issues." *2416 Corp. v. Board of Trustees,* 209 Ill. App. 3d 504, 508, 568 N.E.2d 276 (1991).

The bonds at issue were payable from the lease payments New Neosho Paper Products contracted to make. The bonds were secured by the facility being leased to the tenant. Once all bonds had been paid in full, the tenant would have had the option to purchase the facility from the City for a nominal fee.

Public bonds constitute contracts. 64 Am. Jur. 2d, Public Securities and Obligations § 27. When construing contracts,

"[i]t is not the function of the courts to make contracts but to enforce them. [Citation omitted.] The duty of courts is to sustain the legality of contracts when fairly entered into, and if reasonably possible to do so, rather than seek loopholes and technical legal grounds for defeating their intended purpose." *Fourth Nat'l Bank & Trust Co. v. Mobil Oil Corp.,* 224 Kan. 347, 353, 582 P.2d 236 (1978).

The contract here is found in the city ordinance published in the Chanute Tribune on June 25, 1983, which described the bonds that were being offered by the City. The appellants correctly point out that the words "the bonds" sometimes refers to all of the bonds—coupon and registered bonds. The appellees misconstrue the use of the words "the bonds" to always include the registered bonds. Sometimes that is true; sometimes it is not. This is really unimportant because when the ordinance wants to include registered bonds in the terms of whatever is being discussed, phrases such as "all bonds then outstanding" are used.

References to registered bonds as junior in lien to the coupon bonds are made in several places in the ordinance and the official statement. On page 3 of the ordinance, in section 3, two references are made to the registered bonds as "junior lien bonds" including the quote, "The registered Bonds maturing June 15, 1994, shall be junior in lien to the coupon Bonds." On page 7

of the ordinance, a form of the coupon bond is printed and the coupon bond is clearly designated as "first lien" in the caption. On page 12 of the ordinance, the form of the registered bond is printed and the registered bond is clearly designated "junior lien" in the caption. On pages 12-13 of the ordinance it is made clear that the registered bond form shall be identical to the coupon bond form except for certain listed textual changes. One of the changes includes a paragraph that ends with the following sentence: "This Bond is subject to the prior lien of the coupon Bonds issued pursuant to Ordinance No. ____."

As mentioned earlier, when the City wants to clearly refer to all bonds, the ordinance uses such words as "then outstanding bonds" or "of the bonds herein authorized at the time then outstanding." The appellees correctly represent that all bondholders are given equal voting rights concerning changes in the covenants of the City, issuance of additional bonds, amendments to the ordinance, reduction in the aggregate principal amount of the bonds, amendments to the lease, enforcement of the bonds, and acceleration in the event of default (not an exclusive list). Equal voting rights for different classes of stock or bonds does not, however, mean equal priority in terms of payment. *Cf.* 18 C.J.S., Corporations §§ 148-162.

The appellants and appellees cite only two cases to this court and contend that there are no other cases that are helpful in this jurisdiction or any other. While not doubting the statements of learned counsel, we also have researched the question, and our research has yielded but one other case which is only marginally helpful.

None of the cases cited herein address the exact question that is being presented in this case. They are, therefore, of little assistance, but will be referenced for the points that they do make.

In *Petition of First Interstate Bank,* 767 P.2d 792 (Colo. App. 1988), the probate court in Colorado was asked to decide whether a refinancing of a nursing home which had defaulted on payments due on the bonds could be approved. The proposed refinancing would generate sufficient funds to pay off the series A bonds but not the series B bonds, but both series would be discharged.

The court ruled that the trustee could approve the refinancing under the terms of the bond ordinance.

The series B bonds in *Petition of First Interstate Bank* were similar to the registered bonds in the instant case because they had been issued to the seller of the nursing home as part of the sale price. In *Petition of First Interstate Bank*, the bonds were secured by a mortgage on the real property rather than by a lease, as in the instant case. An additional difference is that the trustee of the series A and series B bonds was expressly directed by the trust instrument

"to maximize the return primarily of the Series A, and secondarily, of the Series B, bondholders. This subordinate status was expressly agreed to by the B bondholders. The instrument specifically directs the trustee, when determining an appropriate remedy for default, to consider the interest of the series A, and not the series B, bondholders." 767 P.2d at 796.

The appellees and the trial court would also distinguish *Petition of First Interstate Bank* by saying that the ruling therein did not cancel the series B bonds, but left them in the same subordinated position. That, however, is not true. The refinancing which was approved by the court in *Petition of First Interstate Bank* did require that series A and B bonds were both canceled even though only series A bonds were paid. 767 P.2d at 794, 796.

Despite language in the trust that would prevent the series B bondholders from being further subordinated to any future issuances of series A bonds, prevent additional indebtedness on a parity with that to the A bondholders, change the terms of the payment, or deprive the bondholders of their outstanding liens, the trial court approved, and the Court of Appeals of Colorado further affirmed, the refinancing which fully paid the series A bonds and canceled both the series A and series B bonds. The court said:

"Here, these additional trust provisions apply only to amendments to an ongoing indenture, not to remedies in event of default. This conclusion is supported not only by the language in the sections themselves, which refer to 'amendments or modifications,' and the internal contractual inconsistency that would result from extending the sections to apply in event of default, but also by explicit language in the indenture article concerning default remedy be applied 'to payment of principal and interest on the Parity [A] bonds first and then to Subordinated Series 1983-B Bonds.' *By using this language, the drafters clearly foresaw, and the B bondholders accepted, the*

*risk that there would be insufficient funds to satisfy their liens in event of default."* 767 P.2d at 795-96. (Emphasis added.)

Another case is *Whitehill v. Seaway Port Authority of Duluth,* 349 N.W.2d 313 (Minn. App. 1984). In *Whitehill* the court was asked whether earliest maturing bonds should be paid in full for both principal and interest, or if what money remained from the facility financed by the industrial development bonds should be used to pay out pro rata all bondholders based on accrued interest. The court found the situation required that the proceeds of the sale of the facility should be used to make scheduled interest and principal payments as they came due until an insufficiency in the fund existed at the due date. Little of this case is helpful because, as in *Petition of First Interstate Bank,* the answer depends on the language of the bond resolution issuing the bonds. The court said:

"Read as a whole, the documents indicate that it was the Authority's interest in the Lease, and not its interest in the real property, which was the bondholders security. *Had the Authority and bond purchaser wanted the proceeds from the sale of the facility prorated among all bondholders whether bonds had matured or not, rather than deposited in the Bond Fund, the Resolution could have provided for this alternative. It did not."* 349 N.W.2d at 316. (Emphasis added.)

Pursuant to the fact that the funds were deposited in the bond fund, the court held that the funds should be distributed according to the priority provisions in the relevant section and not prorated.

The only other case found which might be somewhat helpful is *State ex rel. Benton County, etc. v. Forsyth,* 170 Wash. 71, 15 P.2d 268 (1932). Again, in this case there was not enough money to pay off all of the bonds issued and the court was asked to decide whether series B of the first issue should be paid before Series A of the second issue of the bonds. Section 13 of the statute that provided for the issuance of such bonds read in part as follows: "The assessment upon real property shall be a lien against the property assessed . . . . And the lien for the bonds for any issue shall be a preferred lien to that of any subsequent issue." 170 Wash. at 76. In order to give effect to that statutory language, the court ruled that series B of the first issue and every

series of that issue must be paid before series A of the second issue could be paid. 170 Wash. at 79.

The clear principle that can be taken out of these cases is that the courts make every effort to construe the contract between the bondholders and the city as it was intended at the time of its making. While there is a great deal of case law on whether bonds of one issue, but maturing at different dates, should be paid by maturity date or by pro rata payments (in the event of insufficient funds at default), we are unable to find any case law in which a class of bonds is designated as junior in lien to another class of bonds and what effect designating bonds as "junior lien" would have on priority of payment.

Priority of payment and junior lien, however, are clear concepts in the law. "First lien" is defined by Black's Law Dictionary as "[o]ne which takes priority or precedence over all other charges or encumbrances upon the same piece of property, and which must be satisfied before such other charges are entitled to participate in the proceeds of its sale." Black's Law Dictionary 635 (6th ed. 1990). "Junior lien" is defined as a "lien which is subordinate to [a] prior lien." Black's Law Dictionary 851 (6th ed. 1990).

The bonds were clearly designated so that the bondholders could see that the coupon bonds were "first lien" and the registered bonds were "junior lien." Not only was it clearly designated in the caption of the bonds printed on both the bond certificate and on the cover of the bond, it was also clearly printed in the text of the junior lien registered bonds that "[t]his Bond is subject to the prior lien of the coupon Bonds issued pursuant to Ordinance No. ____."

Additionally, the official statement summary also clearly tells prospective purchasers that the junior lien registered bonds are subordinate to the first lien bonds. Additionally, on page 9 of the official statement summary, the City detailed some of the risk factors associated with this offering. They include: (1) The bonds do not constitute indebtedness to the City of Chanute, Kansas; (2) the tenant and its parent are new businesses and the ability to honor the lease agreement will depend on the success of the tenant; (3) the business of the tenant is extremely competitive and any shortage in supply, labor difficulties, etc. can

adversely affect its business; and (4) the tenant is a new corporation, has not conducted any business yet, and has no business record on which bondholders could rely. Clearly, the concept of default must have been considered in light of the risks detailed by the City to prospective purchasers.

Provisions for repayment under default if insufficient funds existed for repayment of all bonds are found in the statement that the facility is subject to the prior lien of the coupon bonds. The meaning of prior lien is clear. It must be paid off before the sale proceeds are free to be distributed to liens that are not first liens. Provisions giving equal voting rights to the registered bondholders do not contradict such a provision, do not make it ambiguous, and do not make it void.

The registered bondholders took those bonds knowing they were junior in lien to the coupon bondholders. Knowing they were junior, they took the risk that in the event of default, there might not be sufficient funds to pay off both the coupon bonds and the registered bondholders. In that event, they knew or should have known that they would be paid only after all coupon bondholders were paid in full. Apparently, to make that risk worthwhile, their interest rate was higher than that issued for the coupon bondholders. This is not an ambiguous contract. It does not provide room for the court to interpret it. We must simply apply the terms of the contract to the trust created by the court for distribution of the existing funds to pay off some of the principal on the outstanding bonds.

As to whether among the coupon bonds the holders should be paid in full according to earliest maturing date, or redeemed in inverse order, or pro rata, that issue is not before the court and we do not address it at this time.

This matter is reversed and remanded to the trial court for proceedings consistent with this opinion.