No. 71,971

STATE OF KANSAS, *Appellee*, v. JERRY D. RICE, *Appellant*.

932 P.2d 981

Opinion filed January 31, 1997.

*Carl E. Cornwell,* of Cornwell & Edmonds, of Overland Park, argued the cause, and *Keith C. Sevedge,* of Lenexa, was with him on the brief for appellant.

*Michael Russell,* assistant district attorney, argued the cause, and *Nick A. Tomasic,* district attorney, and *Carla J. Stovall,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: This case involves Jerry D. Rice's conviction of the September 14, 1992, first-degree murder of his wife, Dorlinda "Lindy" Stakely-Rice, in which a sentence of life imprisonment with no chance of parole for 40 years was imposed. After appeal to this court, we remanded for a hearing to consider the merits of Rice's claim of ineffective assistance of counsel. The trial court found that although Rice's Missouri-licensed trial counsel labored under an incorrect understanding of Kansas law which caused Rice to decide not to testify, nevertheless counsel's representation was not so deficient as to require a new trial. Rice appealed, alleging both trial errors and his counsel's ineffectiveness.

*Statement of Facts*

The evidence was hotly disputed, and much of the testimony was contradicted by other evidence. The following is a summary of the testimony of the many witnesses presented.

The case against Rice was proven by circumstantial evidence. No body was ever found, and no witnesses had observed Rice murder Lindy. On September 14, 1992, Lindy telephoned Margaret Flynn, her mother, about 11 to 11:15 p.m. Lindy was upset and said she was leaving and bringing the children over to Flynn's house because Rice was acting crazy. She said Rice was demanding $20,000. Flynn did not see or hear from Lindy after that conversation, even though she was in the habit of talking to her daughter every day. Flynn said Rice told her Lindy had left by car. In addition, Flynn claimed Rice did not file a missing persons report

with the police, despite his promise to do so, until she told him she was going to file one.

Flynn testified she had given Lindy keys to her house and vehicles. Lindy kept those keys in the bottom of her purse because she did not want anyone to know that she had them. About 2 months after Lindy's disappearance, Rice returned the keys.

Terrisa Hicks, Lindy's eldest daughter, was pregnant when her mother disappeared and had told her the due date was November 12, 1992. Lindy was planning to be at the birth along with her mother and grandmother so they could take a picture of five generations. Lindy was not present when Hicks gave birth. In March 1993, Hicks' child died. Again, Hicks heard nothing from her mother.

Before Lindy disappeared she had scheduled abdominal surgery for her young son, Mark Lyons, Jr. (Mark). She had been very concerned about the surgery and had been planning to go. However, when Mark had the surgery, she was not there.

Jackie Rowland, Lindy's sister, testified that Lindy was "very big on holidays." However, Rowland had not received any birthday card from Lindy since her disappearance. Neither had any other family member.

On a Friday in mid-September 1992, Lindy had contacted Marilyn Hobbs, an intake coordinator at the Salvation Army, about a detoxification program for cocaine users. She wanted to get into a program where Rice did not know where she was. Hobbs told Lindy they did not have bed space but that she should call back the following Monday. Lindy did not.

Late at night on a Thursday in October, Hobbs received a collect telephone call from someone named Dolinda, Dorlinda, or Belinda. The voice, which did not sound like Lindy's, said, "I'm with three girls" and then hung up. Hobbs called Rice to tell him she might have gotten a call from Lindy.

A number of witnesses found it incredible that Lindy would leave her children with Rice. Flynn testified Lindy had never left her children with Rice. Rowland agreed that Lindy would never have left her children with him. Rowland's daughter, Melissa, agreed and also testified that Amanda Lyons, Lindy's daughter, was

distant from Rice and thought he was a bad man. Hicks testified there was not much of a relationship between the children and Rice. They stayed away from him, and he would always eat upstairs alone away from them. Rowland testified that when Mark and Amanda returned to Kansas after Rice had taken them to Minnesota, they had a panic attack when they thought they were being driven to Rice's house. Carolyn Stevens testified that Lindy would not have left her children and spoke of taking them with her when she did talk about leaving Rice.

Lela Faye Chambers said she "took up" with Rice and moved into his house on September 18, 1992. She claimed Rice had told her at the time that his wife had left with another man early in the morning 5 weeks before. When she asked him what he would do if she returned, he said he would tell her to "get the hell . . . off the hill." Chambers testified she took care of Mark and Amanda and they acted scared and frightened. They would get very nervous when she asked them what happened to their mother and indicated they were not supposed to talk about it. When police came to search the house, Rice watched from a nearby expressway and questioned Chambers about what the police did when he saw her later. According to Flynn, Chambers was Rice's girlfriend while Lindy was alive. She moved in with Rice the day following Lindy's disappearance.

Mark Lyons, Sr., testified he was Lindy's third husband and the father of Mark (10 years old at the time of trial) and Amanda (6 years old at the time of trial), two of Lindy's children and principal witnesses in the State's case. Lyons testified that in October 1992, Rice telephoned him and told him he was bringing the children up to Minnesota for a visit. When Rice arrived, he acted nervous and told Lyons that Lindy had run off.

After living with his father for about a week, Mark began talking about what had happened to his mother and said he thought Rice had killed her. About a week later, Amanda began talking about the same events.

The State called both Mark and Amanda as witnesses. Mark testified he had not seen his mother since before Rice took him to Minnesota to live with his father. He testified she did not contact

him on either of his two most recent birthdays, send him cards, or give him any presents. Nor did he see her at Christmas.

The last time Mark saw his mother was in Kansas on a night when Rice and Lindy were fighting. Lindy was lying on the ground outside while Rice was sitting on her and hitting her in the face with his fist. Then, in the kitchen, Lindy was pushing Rice and screaming while Rice hit her in the face. Later, in Amanda's room, Rice hit Lindy in the face and stomach with his fist. By this time, Lindy was moving only a little bit and saying nothing. Then, according to Mark, Rice dragged Lindy upstairs by her hair. Once they were upstairs, Mark heard the bed moving. In the course of the altercation, a china cabinet was destroyed.

Mark testified that Rice told him to go to his room, but he had come back out when he heard his mother scream. Rice told him to tell no one what he had seen.

Mark further said that the next morning Rice told Amanda and him not to go upstairs. When Rice went outside to sell a truck, Mark and Amanda went upstairs to find their mother. They found the bathroom door closed and blocked by a dresser. They moved the dresser a little bit—enough to open the door to see in. Lindy was lying on the floor, her face bruised and her eyes closed. She made no sound and did not respond when they called to her. When they heard Rice coming back inside, they ran downstairs into Amanda's room and pretended to be playing so they would not get into trouble.

Rice took Mark and Amanda to the sitter's house, and when they returned, Rice permitted them to go upstairs. The dresser was moved back into its original place, and Lindy was not in the bathroom.

Amanda's testimony largely corroborated Mark's, although it varied in a few details. She recalled Rice punching her mother in the face that night before she disappeared. She also saw him kick Lindy in the ribs and drag her upstairs by the hair. Amanda tried to call 911, but Rice had disconnected the telephone. She recounted the same story as Mark had regarding the next morning and their investigation of what had happened to their mother. She also testified that Rice made them pick up the pieces of the broken

china cabinet and they cut their feet while collecting the shattered glass. Like her brother, she had no contact with her mother after that night.

On cross-examination of Mark and Amanda, Rice's counsel pointed out the inconsistencies in the stories they had told at various times about their mother's disappearance, including a story Mark told that a white car had arrived early in the morning following the beating and that when he saw his mother on the bathroom floor, he thought she might be sleeping. On redirect, Mark clarified that he did not see his mother get into the car that came by and thought his mother was dead when he saw her lying in the bathroom.

The State also presented evidence of several claimed suspicious actions after the alleged crime to show that Rice had attempted to destroy evidence to escape detection. In the summer of 1992, before Lindy's disappearance, Lindy, with the help of friends and relatives, remodelled the house where she and Rice lived. They took down pictures and painted the walls; scrubbed and shampooed the carpeting, covering damaged areas with rugs; and refinished woodwork and cabinets. They had not replaced the carpeting because Rice said they did not have enough money.

In mid-September 1992, shortly after Lindy's disappearance, Rice commissioned William Schaal to redecorate the house, including new paint and carpeting of the stairway, the upstairs bedroom, and the upstairs bathroom in which the children had seen Lindy during the beating on the night of her disappearance. The only carpeting that was replaced was in these three areas.

Rice and Lindy's house was located next to a landfill where a yellow bulldozer was kept. Hicks had seen Rice use the bulldozer from time to time in his yard. About 2 days after Lindy's disappearance, Mark saw Rice operating the bulldozer in the landfill near the house.

The abandoned Argentine mines run under Rice's property. Subsidences, or sinkholes, open up from the surface periodically as the ceilings of the mine shafts collapse. Numerous subsidences existed in the area of the house.

A witness testified that one hole that led into the mines was filled in by Rice with a bulldozer in late September 1992. A police search of the house and grounds with several officers and cadaver dogs revealed no forensic evidence.

The defense called numerous witnesses to testify on Rice's behalf. Robin Jones, who testified she was Lindy's best friend, saw Lindy on September 14 and testified that Lindy was having an argument with Rice about the business books of a bar they operated. She also testified that Lindy used both prescription and street drugs. In addition, she testified that Lindy had left her children with Rice on one occasion for 3 to 5 days and that Rice and the children had a close and loving relationship. (Another defense witness, Mary Collins, later corroborated that Rice and the children had a loving relationship.) Jones said that at one point in 1990, Lindy left the children with her for 3 months, never visiting and calling only occasionally. She testified she had seen Lindy in a drunken state, passed out, and unable to be awakened. Jones acknowledged that Lindy and Rice fought, but attributed the bruises to Lindy being clumsy. She testified the photograph showing Lindy with black eyes was from her former marriage, as Mark Lyons, Sr.'s, house appeared to be in the background. Finally, Jones testified that she had made and distributed fliers with Rice to try to locate Lindy after her disappearance. On cross-examination, Jones admitted that Lindy had told her three or four times that Rice had beaten her.

Monte Morris testified for the defense, stating that he knew the Rices and that in August 1992, Lindy had told Flynn and him that she was going to leave Rice.

Mary Collins testified that when Lindy redecorated, she had painted around some of the pictures on the walls and that some of the carpeting that was later replaced smelled strongly of urine from one of the children. She also testified that the photograph of Lindy with black eyes had been used in a divorce from her previous husband. Delores Stuart also testified this was true.

Jamie Beech testified she had taken care of Lindy's children for 3 months in 1988 and that Lindy had visited only twice and had

never called on the telephone, but that Rice came by regularly with money for food.

Ted Jansen, who operated the bulldozer at the landfill, testified that the company records showed that no bulldozer was on the site in September 1992. He said he never knew of Rice operating one of the bulldozers and that when equipment is left at the landfill it is incapacitated by lifting the seat and taking off the negative battery cable.

Rice's mother, Bernice Rice, testified that Flynn had told her, "Oh don't worry about Lindy, she has been missing before several times, and one time she was gone for three years but she always came back."

The defense also called four witness who claimed to have seen Lindy after September 15, 1992. The first was Theresa Prenger. Prenger was a bartender in Jefferson City, Missouri, who claimed to have a habit of memorizing people and their drinks. She testified that once in October or September 1993 she saw Lindy at the bar where Prenger worked. On cross-examination, she admitted she could not remember what Lindy had to drink, but presumed it was beer. She also admitted that she thought she had seen Lindy on another occasion, but found out she was mistaken.

Carl Berryman was the owner of a topless juice bar in Booneville, Missouri. He testified that Lindy came to work for him in June or July 1993. At the time, she used the name Cindy Brusso. On cross-examination, Berryman testified that the picture on the driver's license of Sandra Brusso was of the same person who had danced in his bar. The State later brought in Brusso, who testified she was the woman to whom Berryman had referred.

Sami Stern testified that she had known Lindy for over 20 years. She testified she had seen Lindy at a bar in Booneville, Missouri, on May 19, 1993. Stern knew Lindy was missing and encouraged her to go back and let people know she was alive. Lindy reportedly replied, "No, you don't understand. You don't understand." The next day Stern met with Lindy at Taco Bell and brought up the subject of Rice's trial. Again, Lindy responded, "You don't understand the circumstances." Stern also testified that this was not completely unusual for Lindy and that Lindy and she had gone to Me-

ridian, Mississippi, for a year on a whim several years before. Stern produced a friendship ring that she claimed Lindy had taken off and given to her in Booneville. After allegedly meeting with Lindy, Stern did not call the police or Lindy's family, but contacted Rice's sister before the trial.

Joanne Siler also testified to seeing Lindy after her disappearance. Siler claimed she had seen Lindy at Oak Park Mall in Overland Park, Kansas, on August 29, 1993. Siler watched Lindy nervously looking out the door of a Dillard's store as if she seemed to be waiting for someone. She did not approach Lindy because she did not think Lindy would know who she was. Siler continued to watch her for about 12 minutes. After a while, a man arrived and walked with Lindy into the main part of the mall. Siler did not know Lindy well but claimed to know her by sight. She had talked with her only once, briefly, at a funeral. After seeing Lindy at the mall, Siler did not contact the police, the district attorney, Rice, or Rice's defense counsel, but told a friend, who in turn contacted Rice's sister, Dixie Frazier. Siler admitted she was a good, long-time friend of both Rice and Frazier.

In rebuttal, the State recalled Jackie Rowland, who testified that Lindy was not in Meridian, Mississippi, with Stern at the time Stern had claimed. Rowland also testified she did not know who Stern was. The State also recalled Lindy's daughter, Terrisa Hicks. Hicks testified she wore the same size ring as Lindy and that the ring Stern claimed Lindy had given her was too large.

Hicks also disputed Beech's testimony that she had taken care of Lindy's children for 3 months while Lindy had almost no contact with them. She testified that during the 2 months Beech babysat, Lindy talked with Hicks daily by telephone and visited three times a week. Lindy fired Beech as a babysitter after Beech stole a television set from Lindy. Hicks also testified that Rice did operate a bulldozer around his house.

Flynn was also called to testify in rebuttal. She testified the house in the picture showing Lindy bruised was Flynn's house, not Mark Lyons, Sr.'s. Further, she testified that Robin Jones had not kept Lindy's children for 3 months as she had claimed, but only babysat with them periodically. To rebut the testimony of Prenger, Flynn

testified that Lindy very rarely drank beer, but preferred other drinks. She also testified that while she knew most of Lindy's friends, she did not know Stern. Likewise, she countered the testimony about Rice. not having access to the bulldozer by testifying she had seen him hot wire it and use it. Finally, Flynn denied she had told either Rice's mother or Collins not to worry because Lindy had disappeared before.

Terry Brown testified for the State that he had dated Stern at one point and that at the time she claimed to be Rice's "savior" because she could produce a videotape of Lindy at a meeting at a lake on Memorial Day weekend in 1993. She also told him she had known Frazier for quite some time.

The State called Frazier as a rebuttal witness as well. The State questioned her about her relationship with defense witnesses Siler and Stern and how they contacted her with their stories. Then, over the rigorous objections of defense counsel, the State questioned Frazier about her role in the events of the morning of September 15, 1992. She was asked whether she had told Pam Whitten, who was staying at her house at the time, that she had gone over to Rice's house, had seen Lindy lying on the bed, had put a mirror up to her nose to see if she was breathing, and had seen the house in disarray. Frazier denied both that she had told Whitten these things and that they were true. The defense declined to cross-examine Frazier on the belief that admitting her testimony was reversible error.

The State then called Whitten. Again, the defense vigorously contested the admissibility of her testimony in rebuttal. Whitten testified she was living with Frazier on September 15, 1992. She had arrived at 9 a.m. to find no one there. A short time later, Frazier came in, pale and shaking. Whitten said Frazier recounted that Rice had called her over to his house. When she arrived, Rice was sitting on the bed holding Lindy, rocking her, and telling her he was sorry. The house was a "total wreck" and a hutch had been destroyed. Rice told her he had beaten Lindy and they had made up and then made love, but the next morning he could not wake her. Frazier checked for a pulse and put a mirror to Lindy's face, but there were no signs of life. Rice then sent Frazier home be-

cause he did not want her involved. Later that day, Rice dropped the children off to be watched, and Frazier told Whitten that Rice said he was going to dispose of the body and clean the house.

On cross-examination, Whitten testified that she did not call the police after the incident but instead went to sleep. She admitted she called and threatened Frazier in May 1993. She also testified Frazier drove a white car.

In rejoinder, Frazier testified that Whitten was an irresponsible drug user and drug dealer who owed her money and had promised to leave town if Frazier gave her money.

After being convicted, Rice appealed, raising eight issues.

*I. Did the trial court commit reversible error by permitting the testimony of Pam Whitten to be admitted in rebuttal, contradicting the testimony of another State rebuttal witness?*

Rice argues that it was improper to allow the State to call Frazier as a rebuttal witness, knowing she would deny having told Whitten she had seen Lindy dead, and then call Whitten to impeach her. He argues Frazier's testimony contradicted no evidence offered by the defense and thus was inadmissible as rebuttal evidence. Further, Rice argues that because it was clear at the preliminary hearing that Frazier would deny Whitten's story, the State was not surprised by her adverse testimony and, thus, it was impermissible to call Whitten to impeach her. Finally, Rice argues that Whitten's testimony, as hearsay, was inadmissible in its own right, and that a number of federal cases establish that the State may not knowingly elicit testimony from a witness in order to impeach the witness with otherwise inadmissible evidence.

The State argues Frazier was properly called and questioned as a rebuttal witness because some of the defense witnesses came to the attention of defense counsel through her and it was proper to explore the nature of her relationship with them to prove witness bias. The State also argues that questioning Frazier about whether she saw Lindy dead both rebuts the defense contention that Lindy was still alive and establishes Frazier's bias and motivation to recruit her friends to testify they had seen Lindy after her disappearance. Once Frazier denied she had seen Lindy's dead body,

the State contends she could be impeached by extrinsic evidence under K.S.A. 60-420.

"Rebuttal evidence is that which contradicts evidence introduced by an opposing party. It may tend to corroborate evidence of a party who first presented evidence on the particular issue, or it may refute or deny some affirmative fact which an opposing party has attempted to prove. It may be used to explain, repel, counteract, or disprove testimony or facts introduced by or on behalf of the adverse party. Such evidence includes not only testimony which contradicts the witnesses on the opposite side, but also corroborates previous testimony. The use and extent of rebuttal [evidence] rests in the sound discretion of the trial court and its ruling will not be reversed unless it appears the discretion has been abused to a party's prejudice." *State v. Prouse*, 244 Kan. 292, Syl. ¶ 2, 767 P.2d 1308 (1989).

Frazier was a proper rebuttal witness as she was acquainted with witnesses who claimed to have seen Lindy alive after her disappearance and was the person these witnesses contacted, instead of the police. That her story of how she came in contact with these witnesses varied from their own stories was certainly material. In addition, Whitten's testimony that Frazier claimed to have seen Lindy's dead body was also proper rebuttal evidence in that it directly contradicted the defense theory of the case and corroborated the previous testimony of Mark and Amanda that they, too, saw Lindy's body. To the extent that Frazier's testimony was necessary to permit the introduction of Whitten's testimony, as explained below, it was proper rebuttal evidence.

The cornerstone of Rice's argument is that Whitten's testimony, while perhaps relevant for rebuttal, constituted inadmissible hearsay. Our analysis leads us to a contrary conclusion. Whitten's testimony related both to statements made by Frazier about her own conduct and statements made by Frazier about what Rice had told her. K.S.A. 60-460(a) makes it plain that Whitten's recounting of Frazier's statements is not inadmissible hearsay. K.S.A. 60-460(a) provides that the following is not inadmissible hearsay even when offered for the truth of the matter:

"A statement previously made by a person who is present at the hearing and available for cross-examination with respect to the statement and its subject matter, provided the statement would be admissible if made by declarant while testifying as a witness."

Frazier was present at the hearing, testified on behalf of the State, and was available for cross-examination. The defense had the opportunity to cross-examine her, but failed to do so, though in fact Rice availed himself of the opportunity to confront Frazier by calling her as a witness in rejoinder.

Likewise, the statements Whitten claimed Frazier attributed to Rice are not inadmissible hearsay because of the combined effect of K.S.A. 60-460(a) and K.S.A. 60-460(f), which concerns the admissibility of uncoerced confessions.

Thus, Whitten's testimony is not inadmissible hearsay. It was proper to rebut the defense evidence that Lindy had been seen alive by Frazier's friends apart from whether it also had the effect of impeaching Frazier.

The State complied with the requirements of K.S.A. 60-460(a) to admit Frazier's out-of-court statement. See *State v. Ralph*, 217 Kan. 457, Syl. ¶ 1, 537 P.2d 200 (1975); *State v. Bagemehl*, 213 Kan. 210, 214, 515 P.2d 1104 (1973); *State v. Jones*, 204 Kan. 719, 729, 466 P.2d 283 (1970) (cases applying K.S.A. 60-460[a]) to permit declarants' out-of-court statements in criminal cases). The State also satisfied the further requirement that the declarant in a criminal case actually testify and be subject to cross-examination imposed in *State v. Fisher*, 222 Kan. 76, Syl. ¶ 5, 563 P.2d 1012 (1977). See *State v. Wise*, 237 Kan. 117, 120, 697 P.2d 1295 (1985). Putting Frazier on the stand prior to admitting Whitten's testimony, while not technically required, was the best practice and served to limit the possibility of reversible error if Frazier had refused to testify, invoked her Fifth Amendment rights, or had no recollection of the events at issue. See *State v. Lomax & Williams*, 227 Kan. 651, 660-661, 608 P.2d 959 (1980) (witness claiming no memory of events "unavailable" and prior statement of witness would prejudice accused's right of confrontation); *State v. Clark*, 222 Kan. 65, 71, 563 P.2d 1028 (1977) (better practice to put declarant on the stand prior to introducing declarant's statement); *State v. Hale*, 207 Kan. 446, 452, 485 P.2d 1338 (1971) (declarant refusing to testify not "available" under K.S.A. 60-460[a]).

Rice relies on *State v. Potts*, 205 Kan. 47, 468 P.2d 78 (1970), and *State v. Lomax & Williams*, 227 Kan. 651. Both cases are read-

ily distinguishable. In *Potts*, we held the trial court did not err in permitting the State to impeach its own witness during direct examination where it was surprised by the witness' trial testimony. 205 Kan. at 52. We later summarized the important point of the case: "The clear holding of *Potts* is that evidence of prior hearsay statements cannot be used to impeach a witness who simply refuses to testify or testifies that he cannot remember anything." *Lomax & Williams*, 227 Kan. at 660. In *Lomax & Williams*, the declarant testified she could not remember anything and so was not available for cross-examination and confrontation. In the present case, in contrast, Frazier claimed neither a right not to testify nor that she could not remember the events in question. Instead, she testified that they did not occur. Thus, Frazier's testimony about the subject of her prior statement was that she had made no such statement. If this alone were not enough to permit meaningful confrontation, she also testified about the subject matter of the alleged statement by denying the truth of the contents of the statement as well. Rice, thus, had the opportunity to fully cross-examine the declarant about the circumstances surrounding the alleged statement, whether the statement was made, and whether it was true.

Unlike the present case, the federal cases on which Rice relies involve instances where the testimony adduced was inadmissible on its own under the federal rules of evidence and impeachment of a prosecution witness was the only colorable reason to support its admission. See *United States v. Gomez-Gallardo*, 915 F.2d 553, 555-56 (9th Cir. 1990); *United States v. Peterman*, 841 F.2d 1474, 1479 (10th Cir. 1988), *cert. denied* 488 U.S. 1004 (1989). Although factually similar federal cases have reached a result opposite of that we reach here, this is because the Kansas rules of evidence permit the admission of hearsay evidence that the federal rules of evidence do not. See *United States v. Crouch*, 731 F.2d 621, 623 (9th Cir. 1984), *cert. denied* 469 U.S. 1105 (1985); *United States v. Coppola*, 479 F.2d 1153, 1158 (10th Cir. 1973). Under the federal rules of evidence, there is no hearsay exception comparable to K.S.A. 60-460(a) where a witness' prior statement is not made under oath and subject to cross-examination. See Fed. R. Evid. 801(d)(1) (not hearsay if witness' prior statement under oath and subject to cross-

examination); Fed. R. Evid. 802 (hearsay inadmissible unless within enumerated exceptions); Fed. R. Evid. 803 (listing exceptions but not including prior statements of witnesses not made while under oath and subject to cross-examination).

The trial court did not abuse its discretion in permitting the testimony of Frazier and Whitten in the State's rebuttal case.

*II. Was the admission of repetitive evidence of spousal abuse reversible error?*

Rice and Lindy were married November 9, 1991. Several witnesses testified regarding Lindy's physical injuries and her allegations that they were caused by Rice's abuse. Mark Lyons, Sr., testified that Lindy had told him Rice had beaten her up several times and that during one telephone conversation her voice sounded different because she had a swollen lip after Rice reportedly "beat the hell out of her."

Flynn testified that there had been a long history of Rice abusing Lindy, including bruises, black eyes, threats to kill her if she did not return when she left him, and an incident of pushing her down the stairs, requiring her to use crutches. She identified a photograph of Lindy with her face injured as one taken in her house in 1991. Lindy had claimed Rice inflicted those injuries. Hicks, Lindy's eldest daughter, also testified about the photograph, recounting that it displayed the aftermath of an incident in which Rice had cleared out a bar he and Lindy operated and took her outside and beat her face into the concrete. Flynn also testified that there had been an incident in 1991 in which Rice shot at Lindy.

On another occasion, Hicks testified that after Rice and Lindy had been fighting, Hicks arrived to find Lindy's clothes and furniture burning in the yard. Rice had left Lindy a note threatening to hurt her and telling her "[t]hat little fire is nothing compared to what I'm capable of."

In another incident in the fall of 1991, Hicks testified that Rice threatened to kill Lindy and held a 9 mm gun to her head. This was apparently the same incident Flynn testified to, as Rowland later testified that the gun had been discharged.

Lindy's niece, Melissa, testified that Rice had been about to strike Lindy on one occasion went he saw her come in and stopped. Following this incident, Lindy told her she thought Rice might "go overboard and kill her."

Rowland also testified as to the pattern of abuse inflicted upon Lindy by Rice, including black eyes and injuries requiring splints or crutches. She testified that despite this abuse, Lindy was committed to making the marriage work. She recalled that before one trip Lindy had taken with Rice, Lindy said if anything happened to her to look to Rice.

On August 29, 1992, Rice forced Lindy to get a pelvic examination to prove she had not had an extramarital affair.

Carolyn Stevens, a close friend of Lindy's, also testified she had seen Lindy with bruises Lindy attributed to Rice, including a black eye and bruises on her neck and arms. According to Stevens, Lindy would hide her injuries with makeup, sunglasses, scarves, and long-sleeved shirts. Stevens also said Lindy had stated she thought Rice was going to kill her. September 14, 1992, was the last time she told Stevens that. She also talked about leaving Rice on that date.

Dawn Demotte testified that while she worked at Primary Medical Care under Dr. Sayegh, she did various jobs, including taking patients to physical therapy. She recalled that in 1992, Lindy had come in about 15 to 20 times for illness, injuries, and depression. On six to eight of those occasions, she exhibited some injury that she attributed to Rice. Around the first of September, Lindy came in with bruises on her arms and around her neck, which she claimed Rice had inflicted. Lindy told her that Rice had threatened to kill her and she was scared. She also said that she loved Rice and did not want to leave. At least on one occasion, Lindy did not permit Demotte to write anything down for fear Rice would see it. Demotte also stated, after reviewing the records produced by the doctor's office, that they were incomplete and that the office was under investigation for missing records.

After several witnesses had testified as to Rice's past abuse of Lindy, the defense renewed its objection to this testimony and argued that no more evidence of abuse should be admissible because it would be cumulative. The trial court overruled this objec-

tion, and more evidence of marital discord came before the jury from other witnesses. On appeal, Rice argues the repetitive evidence was so prejudicial that it warrants reversal.

Our reports brim with Kansas cases, going back more than 100 years, allowing evidence of previous cruel and brutal assaults to be used in a marital homicide case on the question of motive and intent for the purpose of showing malice and hatred on the part of the defendant, as well as to show the relationship of the parties or a continuing course of conduct, or to corroborate the testimony of witnesses as to the act charged. See, *e.g., State v. Cheeks*, 258 Kan. 581, Syl. ¶ 1, 908 P.2d 175 (1995); *State v. O'Neil*, 51 Kan. 651, 665, 33 Pac. 287 (1893).

The admission of relevant cumulative evidence is within the discretion of the trial court and will not form the basis for reversal unless the trial court abused its discretion. *State v. Johnson*, 231 Kan. 151, 156-57, 643 P.2d 146 (1982). A trial court abuses its discretion only if no reasonable person would take the view adopted by the trial court. *State v. Lumbrera*, 257 Kan. 144, 148, 891 P.2d 1096 (1995).

Rice argues that the repetitive testimony of many of the witnesses added nothing meaningful to the State's case, since in large part they did not testify about incidents of abuse they had witnessed, but rather to claims made by Lindy that the injuries she sustained were inflicted by Rice. The argument seems to imply that the witnesses did not testify to different incidents of abuse and therefore the evidence has no value. To the contrary, not only do the multiple witnesses corroborate each other, the fact that Lindy told so many people of the abuse Rice inflicted on her and her fears of being killed establishes how important these allegations were to Lindy and the intensity of her fear. The trial court did not abuse its discretion.

*III. Is there sufficient evidence of premeditation to support the verdict?*

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution,

the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Timley*, 255 Kan. 286, Syl. ¶ 13, 875 P.2d 242 (1994). The appellate court looks only to the evidence in favor of the verdict to determine if the essential elements of a charge are sustained. *State v. Patterson*, 243 Kan. 262, Syl. ¶ 1, 755 P.2d 551 (1988).

Rice acknowledges that premeditation may be proven circumstantially, see *State v. Phillips*, 252 Kan. 937, 939, 850 P.2d 877 (1993), but argues that an inference of premeditation may be founded only on facts established by evidence and may not rest on other inferences. Rice argues that because the death of Lindy is itself an inference, an inference that the death was a premeditated killing impermissibly stacks one inference upon another.

Rice cites *State v. Williams*, 229 Kan. 646, 648-650, 630 P.2d 694 (1981), and *State v. Cruz*, 15 Kan. App. 2d 476, 491, 809 P.2d 1233, *rev. denied* 249 Kan. 777 (1991), as authority. In essence, defendant would have this court hold that first-degree murder could never be proven circumstantially in the absence of a body because in such cases the inference of death always accompanies an inference of premeditation. Rice's reliance on *Williams* and *Cruz* is misplaced. In *Cruz,* the court found: "The bottom line of our holding is that findings of guilt are not *justifiable* based on the evidence presented. There was insufficient evidence to support the conclusions." 15 Kan. App. 2d at 492. Thus, the problem in *Cruz* was that the inferences required to support the conviction were patently unreasonable. 15 Kan. App. 2d at 492.

*State v. Doyle*, 201 Kan. 469, 488, 441 P.2d 846 (1968), explains that the prohibition against stacking inferences is a way of requiring that each element of the crime be supported by evidence of sufficient content and strength to prove it beyond a reasonable doubt. The *Doyle* court noted:

"Any finding in this case of deliberation, premeditation, willfulness, or any of the other ingredients of either first or second degree murder could be based only upon a suspicion as foundation for a presumption, and then finally another presumption based upon the primary presumption. Presumptions and inferences may be drawn only from facts established, and presumption may not rest on presumption or inference on inference." 201 Kan. at 488.

*Williams* makes explicit that the concern of prohibiting one inference based upon another is that the final fact inferred might not be adequately supported by the evidence adduced:

"Convictions based on circumstantial evidence, as in the instant case, can present a special challenge to the appellate court. Juries are permitted to draw *justifiable* inferences from proven circumstances and established facts; but the appellate court must determine whether findings based upon inferences are *justifiable* by applying additional rules of law." 229 Kan. at 648-49.

*Williams* restates the rule prohibiting the stacking of inferences in a way particularly appropriate to our discussion here: ·

" 'Another way, perhaps, of verbalizing the rule prohibiting an inference on an inference and a presumption on a presumption is the rule, as stated by some courts, that where reliance is placed upon circumstantial evidence, the circumstances in question must themselves be proved and cannot be inferred or presumed from other circumstances.' " 229 Kan. at 649 (quoting 1 Wharton's Criminal Evidence § 91, pp. 150-51 [13th ed. 1972]).

Thus, as applied to the present case, if the circumstances alleged to justify a finding of premeditation are adequately proven by evidence, and are not merely suppositions themselves, there is no impermissible stacking of inferences such that reversal is required.

This case does not involve an impermissible stacking of inferences or inferences unreasonably drawn from the evidence presented, but is merely a case in which each element of the charge is individually proven circumstantially from facts adduced at trial. Premeditation is the process of simply thinking about a proposed killing before engaging in the homicidal conduct. *State v. Henson*, 221 Kan. 635, 645, 562 P.2d 51 (1977). Whether one thinks about a proposed killing is independent of whether the killing is actually performed. Proof of premeditation, thus, does not rely on proof of a killing. Therefore, contrary to Rice's argument, an inference of premeditation does not rely on an inference of death, but on other circumstances surrounding the death which must be proven by evidence.

"Premeditation and deliberation may be inferred from the established circumstances of the case, provided the inference is a reasonable one. In such case, the jury has the right to make the inference. (*Craft v. State*, 3 Kan. 450 [1866].)" *State v. Buie*, 223

Kan. 594, 597, 575 P.2d 555 (1978). Consequently, both premeditation and homicide may be supported by circumstantial evidence if that evidence is sufficiently strong to support a finding beyond a reasonable doubt that the defendant both premeditated a killing and subsequently committed the homicide.

The evidence presented was sufficient that the jury could determine that Rice acted with premeditation. The testimony of Mark and Amanda establishes that Rice administered more than a single death stroke to Lindy. It establishes that over a span of time and in various locations outside and inside the house, Rice continued a course of conduct that could foreseeably bring about Lindy's death. Rice beat Lindy in the yard but did not stop upon seeing the nature of the injuries his beating had inflicted. Instead, he followed Lindy into the house and beat her in the kitchen and then in another room until she stopped making any noise and lay nearly motionless. Yet, that still did not stop him; he then dragged Lindy up the stairs by her hair. We have held that dealing lethal blows after the victim is rendered helpless by the attacker supports an inference of premeditation and deliberation. See *State v. Henson*, 221 Kan. 635, Syl. ¶ 1.

In *Phillips*, 252 Kan. at 940, we found premeditation could properly be inferred from the fact the defendant continued to kick the victim after he was knocked to the ground and unable to fend off the defendant's blows.

In addition, the long history of marital abuse, which reached a level where Rice threatened to kill Lindy and Lindy feared for her life, was proper evidence of Rice's motive and intent. It was a proper basis, when considered with the evidence of the fight, to conclude Rice's acts were premeditated. See, *e.g., State v. Mayberry*, 248 Kan. 369, 386, 807 P.2d 86 (1991); *Henson*, 221 Kan. at 645 (prior violent acts relevant evidence of premeditation).

There was sufficient evidence for the jury to find the killing to be premeditated.

*IV. Did the trial court commit reversible error by allowing the State to present expert testimony regarding the ability of a key child witness to recall the events he had seen?*

Over the objections of the defense, the State called Dr. John Helminski, a psychologist, as an expert witness. He testified he had examined Mark and talked with him about the events leading up to his mother's death. Dr. Helminski recounted the story Mark had told him along the same lines as the testimony Mark had previously given. He also explained the difference between core events, such as the fact he saw Rice hit Lindy, heard her screaming, and saw her lying motionless on the bathroom floor, and peripheral events such as time, seasons, and what clothes people were wearing. He testified that it is not unusual for a child of Mark's age, 8 years old at the time of the incident, to consistently remember core events, but be unable to recall peripheral details.

Rice argues that the trial court impermissibly allowed Dr. Helminski to bolster the inconsistent testimony of Mark by testifying that children can better recall core events than peripheral details. Rice contends that this expert testimony addressed the veracity of a key witness and was therefore improper and prejudicial, citing *State v. Graham*, 246 Kan. 78, 785 P.2d 983 (1990). Rice maintains that Dr. Helminski's testimony did not meet the standards for the admission of expert testimony.

The State argues that the issue of whether the proper foundation was laid for this testimony was not raised contemporaneously with the admission of the evidence and cannot be raised for the first time on appeal. The State also argues the evidence was helpful to the jury and that it was proper to corroborate the children's testimony because they had been impeached on cross-examination by questions regarding their inconsistent statements about the details of the events they had described. Moreover, the State argues Dr. Helminski offered no opinion of the witnesses' truthfulness, but merely discussed a child's capacity to recall.

" 'The admissibility of expert testimony is within the broad discretion of the trial court. A party claiming an abuse of trial court discretion bears the burden of showing abuse of discretion.' " *State v. Cheeks*, 253 Kan. 93, 99, 853 P.2d 655 (1993) (quoting *Marshall v. Mayflower Transit, Inc.*, 249 Kan. 620, Syl. ¶ 8, 822 P.2d 591 [1991]).

The boundaries of the trial court's discretion are set by statute in K.S.A. 60-456.

"The basis for the admission of expert testimony is necessity arising out of the particular circumstances of the case. To be admissible, expert testimony must be helpful to the jury. Where the normal experience and qualifications of lay persons serving as jurors permit them to draw proper conclusions from given facts and circumstances, expert conclusions or opinions are inadmissible. *State v. Hodges*, 239 Kan. 63, 67, 716 P.2d 563 (1986). An expert's opinion, pursuant to K.S.A. 60-456, is admissible up to the point where an expression of opinion would require him to pass upon the credibility of witnesses or the weight of disputed evidence. . . . . An expert witness may not pass on the weight or credibility of evidence . . . ." *State v. Colwell*, 246 Kan. 382, 389, 790 P.2d 430 (1990).

Dr. Helminski did not give an improper opinion on Mark's credibility. See *State v. Arrington*, 251 Kan. 747, 753, 840 P.2d 477 (1992) (expert testimony that a witness was not capable of being purposefully deceitful was not improper); *Colwell*, 246 Kan. at 391 (expert testimony that witness could distinguish truth from lie and recounting statements witness made in interview not improper); *State v. Clements*, 241 Kan. 77, 80, 734 P.2d 1096 (1987) (testimony that victim/witness acted consistent with having been sodomized gave no opinion of whether witness was telling the truth and was not improper).

However, Dr. Helminski did testify with regard to the weight to be given to the inconsistency of Mark's recollection of peripheral details and thus passed on "the weight of disputed evidence." Thus, the admission of the testimony was erroneous. Moreover, the fact that children recall major events while forgetting minor ones would seem to be within the normal experience of lay jurors and, therefore, again, it should not have been permitted by the trial court.

Where an expert was permitted to opine, based on an interview with a victim/witness, that the witness was telling the truth about being molested by the defendant, we held a new trial was required. *State v. Jackson*, 239 Kan. 463, 470, 721 P.2d 232 (1986). Similarly, expert testimony of police officers that they believe a defendant is guilty of the crime charged may justify reversing the conviction. See *State v. Steadman*, 253 Kan. 297, Syl. ¶ 2, 855 P.2d 919 (1993).

In *State v. Cheeks*, 253 Kan. 93, we held that improper expert witness testimony that permitted jurors to draw an impermissible inference of guilt from the established facts warranted reversal of the conviction. However, the error in the present case is considerably less prejudicial than testimony that directly addresses the credibility of a witness or opines that the defendant is guilty, and the testimony at issue here does not give rise to an impermissible inference of guilt.

In *State v. Graham*, 246 Kan. at 82, we held that improper admission of expert testimony that compared the defendant's photograph to photographs taken during the commission of the crime constituted harmless error in light of other evidence in the case. We said: "[T]here is little, if any, likelihood that this erroneous admission of evidence changed the result of the trial." 246 Kan. at 82. The effect of Dr. Helminski testifying as to what lay jurors would already understand from common experience would be negligible, and the admission of his testimony, although erroneous, is likewise harmless. *See, e.g., State v. Johnson*, 255 Kan. 140, 148, 871 P.2d 1246 (1994).

*V. Did the trial court err in refusing to grant a mistrial when evidence was admitted that the defendant had declined to talk to the police without counsel?*

The State called Kansas City, Kansas, police officer Clyde Mohler as a witness. Mohler testified that as an officer assigned to the missing persons unit, he briefly interviewed Rice on October 20, 1992. The conversation lasted less than 5 minutes while Mohler sat in his police car and Rice stood outside beside the driver's door. The following exchange took place, about which Rice complains on appeal:

"Q. And what was Mr. Rice's demeanor when you first initiated this five minute conversation?
"A. When I first arrived, he was friendly, communicative.
"Q. And what, if any, changes did you see in his demeanor throughout this five minute conversation?
"A. Shortly after our conversation began, he noticed a letter that was lying in the front seat of my police car that we had been given by family members of Dorlinda

Rice. The letter was allegedly from him. He saw the letter, and at that time stated he did not want to talk to me any further until he talked to his lawyer."

Defense counsel objected to this nonresponsive answer as a violation of Rice's constitutional rights. Counsel then explicitly declined to request a mistrial and instead requested a limiting instruction. Upon reflection, counsel moved for a mistrial. The court agreed to permit the parties time to locate authority but determined that, at the least, a cautionary instruction was warranted. Rice's trial counsel argued: "I think the jury should be instructed that everybody, including the jury, has a constitutional right to remain silent and that the elicit [*sic* ] of such testimony to suggest that in any way that is an evidence of guilt is inadmissible under the law." After a break during which neither party was able to find relevant authority, the trial court gave the jury a limiting instruction: "I want to advise you that the last question elicited an answer from Detective Mohler that indicated the defendant had relied on his Fifth Amendment right not to speak to the police, you may not draw from the fact that he asserted a right which is available to all of us, you and me equally as him, any adverse opinion or consequences." The trial court did not grant the motion for a mistrial.

On appeal, Rice argues this evidence was so prejudicial as to amount to reversible error. The State does not argue that Mohler's statement was proper, admissible evidence even though it appears to have been a statement regarding defendant's pre-*Miranda* silence, but rather argues Rice was not prejudiced and a new trial is not required. *Cf. State v. Massey*, 247 Kan. 79, Syl. ¶ 2, 795 P.2d 344 (1990) (use of pre-*Miranda* silence to impeach permissible). Because the parties do not dispute the propriety of the evidence, we assume it was improper.

The trial court may declare a mistrial when prejudicial conduct makes it impossible to proceed with the trial without injustice to the defendant. K.S.A. 22-3423(1)(c). The decision to declare a mistrial lies within the sound discretion of the trial court and will not be reversed absent a clear showing of abuse of that discretion. *State v. Mayberry*, 248 Kan. 369, Syl. ¶ 8. The trial court found the cautionary instruction to be sufficient to cure any error. On appeal,

we have held that a jury will be presumed to have disregarded evidence about which an objection was sustained. *State v. Collier*, 259 Kan. 346, Syl. ¶ 2, 913 P.2d 597 (1996).

In *State v. Barncord*, 240 Kan. 35, 44-45, 726 P.2d 1322 (1986), we found in similar circumstances that gratuitous, nonresponsive remarks by a police officer did not require reversal when the jury was admonished to disregard the evidence.

"Where an unsolicited, unresponsive, and improper remark is given by a witness to a proper question resulting in the erroneous disclosure of evidence, the case turns on whether a limiting instruction was given and the degree of prejudice to the defendant." *Barncord*, 240 Kan. 35, Syl. ¶ 5.

The jury was told to draw no negative implication from Rice's decision not to talk with police before talking with his attorney, and no further mention of the incident was made. In addition, Rice's conduct in declining to talk to the police after seeing that the police had a letter he had written was readily understandable apart from whether he committed the present crime and was unlikely to have influenced the jury, even in the absence of a limiting instruction. The trial court did not abuse its discretion.

*VI. Did the trial court err in refusing to grant a mistrial when evidence was admitted that the defendant was a convicted felon?*

In cross-examining Rowland about her testimony that Lindy would never leave her children with Rice, defense counsel asked, "Did you know that Mr. Rice had made an effort to adopt the children?" Rowland replied, "I know that Mr. Rice called my mother and said that he couldn't adopt the children because he was a convicted felon and wanted my mother to do custody." Defense counsel immediately requested a mistrial. The following exchange then took place out of the hearing of the jury:

"The Court: I can instruct the jury to disregard her answer to the last question if you want me to.

"Mr. Bunch: Judge, I don't want to back off of a mistrial. I, for the record, on this serious of a case, I move for a mistrial.

"The Court: Okay. Well, I'm not going to grant your mistrial.

"Mr. Bunch: Your Honor—

"The Court: I'm not going to grant your mistrial. I understand. I'm going to give you a choice, I will either tell the jury to disregard that last comment, which would probably just reinforce it in their mind, or I'll just let it slide, whichever you want.

"Mr. Bunch: I move for a mistrial. I don't want either.

"The Court: All right. Mistrial is denied."

After this exchange, cross-examination continued with no instruction to the jury.

As a result of Rowland's statement, the jury had before it evidence that Rice was a convicted felon. It was not told to disregard this statement and, thus, from the jury's perspective, was justified in considering it for whatever probative value it might have. The jury was not informed of the nature of the prior convictions, and defendant's status as a felon would have had no tendency to prove his guilt of the current charge.

Nevertheless, inadmissible evidence of no probative value concerning prior crimes can be damaging to a defendant. We have identified three kinds of prejudice that may arise from the admission of evidence of a prior crime:

"First, a jury might well exaggerate the value of the other crime . . . as evidence inferring that, because a defendant has committed a similar crime . . . before, it can be concluded that he committed this one. Second, the jury might conclude that the defendant deserves punishment because he has been a wrongdoer in the past even where the moving party has failed to establish by the proper burden of proof that the defendant has committed the act for which he is now being tried. Third, the jury might conclude that, because of the defendant's past acts, the evidence on his behalf should not be believed." *State v. Peterson*, 236 Kan. 821, 828, 696 P.2d 387 (1985).

The first of those concerns has no application in the present case because the jury was unaware of the nature of any prior conviction and thus could not reason that any similarity to the present offense implied defendant's guilt.

Although in many cases evidence of a prior conviction might tend to inflame the passions of the jury so as to implicate the second and third concerns cited in *Peterson*, in this case the jury had already heard substantial evidence of Rice's felonious conduct in severely beating and maiming his wife and threatening to kill her while pointing a gun at her head. The jury later heard evidence

that without authorization, he repeatedly hot wired a bulldozer belonging to the neighboring landfill. The jury's passions were not likely to be inflamed by this evidence any more than they might have been by other admissible evidence the jury heard. An opportunity for a limiting instruction was disregarded, and no details of any felony conviction were offered. The trial court did not abuse its discretion in refusing to grant Rice's request for a mistrial.

*VII. Did the trial court err in rejecting the defendant's claim for a new trial based on ineffective assistance of counsel?*

On March 31, 1995, after remand from this court, the same district court judge that presided at the trial held a hearing on Rice's claim of ineffective assistance of counsel.

Willard Bunch, Rice's trial counsel, testified he has been a Missouri attorney since 1967, but is not licensed to practice in Kansas. About 80 percent of his law practice involves criminal defense. This was the second case he had tried in Kansas.

On cross-examination, Bunch was shown to have extensive experience. He has tried over 300 criminal cases, represented defendants in 40 to 50 homicides, and previously tried 25 to 30 murder cases. He had earlier represented Rice in another state. He had the assistance of an investigator and had Kansas attorney Dave Clark as his local counsel.

Bunch testified that Rice wanted to take the witness stand to testify that Lindy was alive the morning after he beat her. Rice also would have refuted key aspects of the children's testimony. However, Bunch knew Rice had numerous felony convictions and believed that if he had testified, all of those convictions could come into evidence, as he knew the rule to be in Missouri and in federal court. For that reason, Bunch advised Rice not to testify. Bunch stated he did not consult with Kansas counsel on the question. The admission of Rice's prior convictions was the only reason Bunch advised Rice not to take the witness stand. Had Bunch known the rule in Kansas, he testified he would not have hesitated to have Rice testify.

Had Rice testified, Bunch said he would have questioned him about when Rice last saw Lindy, the nature of his relationship with

Lindy's children, his actions the day of Lindy's disappearance, his burning of trash, and his redecoration of the house.

Bunch admitted that much of what Rice would have testified to was before the jury in the form of testimony from other witnesses and through a newspaper article admitted into evidence, but not read to the jury, reporting on an interview with Rice. However, not all of what Rice would have said was introduced in this way, what was introduced was fragmented, and the jury was not permitted to determine Rice's credibility.

Bunch testified that no evidence was introduced about Lindy's use of drugs, Rice's effort to stop the drug use and hide her drugs the night of their fight, and the fact that Lindy broke the china cabinet by throwing a pot at Rice.

Bunch admitted that the primary trial strategy was to attempt to show Lindy was still alive, but that the jury obviously did not believe such evidence. He further admitted that Rice's demeanor was inappropriate at one time during the trial, but contended that was not the reason he advised Rice not to testify.

Rice also testified at the ineffective assistance of counsel hearing. He denied that he had killed Lindy and said he had told his attorney his version of the events recited at trial. Rice testified that his decision not to testify at trial was based completely on his attorney's counsel that all of his prior convictions could come into evidence if he did.

According to Rice, had he testified, he would have told the jury that Mark and Amanda were not afraid of him and that he did not remodel the house to destroy evidence and, in fact, still had the carpet that was removed. He would have testified that on September 13, 1992, Lindy was using methamphetamine at home and was drunk. Rice took the drugs outside to get rid of them, and Lindy followed. Once outside, a physical altercation erupted during which he hit Lindy. The fight continued inside the house. The next morning when he awoke, Lindy was asleep on the bathroom floor, where she had passed out after vomiting.

Rice said when he came home late the night of September 14, he and Lindy again got into an argument about drugs, although according to Rice it was not physical. In the course of the argu-

ment, Lindy threw a pot at him that broke the china cabinet. He admitted he did drag Lindy up the stairs. He went into the bedroom and locked Lindy out. She attempted to get in but was not successful. That was the last contact Rice said he had with Lindy.

Rice also would have denied operating a bulldozer during the time frame of Lindy's disappearance and would have contradicted some of the contents of the newspaper article admitted into evidence. He also would have testified that Mark had said he saw Lindy get into a car on the night she disappeared.

The trial court received briefs from the parties and, on October 12, 1995, rendered the following decision, which in pertinent parts stated:

"Counsel agree *Chamberlain v. State,* 236 Kan. 650, 694 P.2d 468 (1985) adopting the standards set out in *Strickland v. Washington,* 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984) states the test for determining ineffective assistance of counsel.

"*Chamberlain* states a two part test with the defendant having the burden to establish both parts. They are (1) counsel's performance was unreasonably deficient; and (2) The deficient performance prejudiced the defendant so as to deprive him of a fair trial.

"Defendant's trial attorney . . . admitted he misunderstood the Kansas rule concerning the admissibility of the defendant's past criminal record if the defendant testified. He stated that had he understood the rule the defendant would have testified on his own behalf.

"The defendant also testified in support of his motion. He stated that he did not testify because he believed his past criminal record would come into evidence if he took the stand. He stated he reached the decision not to testify based on the advice of counsel and if he had known his record would probably not come in, he would have testified and denied committing the crime.

"This evidence was challenged by the State by reference to the record, the State's brief and on cross-examination.

"The evidence produced by the defendant is persuasive and is found by the Court to be true. The question left to be decided is whether or not this trial error is sufficient to satisfy both prongs of the test stated above.

"It is this Court's opinion that it does not. The Constitutions of the United States and of the State of Kansas are designed to guarantee criminal defendants fair trials not perfect trials.

"Was trial counsel's performance unreasonably deficient? No. Throughout the trial, defendant had the aid of well prepared, able and effective counsel. Trial counsel's performance was thoughtful and professional. He fully understood the

state's case and effectively cross-examined the state's witnesses. His preparation of the defendant's case was similarly thoughtful and professional. The error to which he now confesses is serious but it is not sufficient for this Court to say his performance was unreasonably deficient.

"Having reached this conclusion, it is not necessary to address the record test. However, it should be clear that the Court's answer to that question would also be 'No.'

"Counsel have been unable to cite to the Court a case reasonably on point and I have not been able to find one. I have read all of the cases cited by both the State and Defendant (citations omitted) and while they were useful in understanding *Chamberlain*, they do not control. The tests set out in *Chamberlain* were followed and applied."

"Motion for new trial on remand is denied."

It is apparent the trial court properly utilized the tests of *Strickland* and *Chamberlain* in reaching its decision. Both parties on appeal, however, cite in their briefs *Taylor v. State*, 251 Kan. 272, 285, 834 P.2d 1325 (1992), and suggest our scope of review is whether the finding by the trial judge was an abuse of discretion. Rice also argues that because the trial court expressly accepted Rice's basic factual contentions and concluded those facts failed to warrant relief as a matter of law, we are obligated to make plenary review of this issue, citing *State v. Field*, 252 Kan. 657, 664, 847 P.2d 1280 (1993); *State v. Sledd*, 250 Kan. 15, 21, 825 P.2d 114, cert. denied 506 U.S. 849 (1992); *City of Chanute v. Polson*, 17 Kan. App. 2d 159, 160, 836 P.2d 6 (1992).

There is wording in *Taylor v. State*, 251 Kan. at 285, which would justify the belief that our scope of review of the trial court's decision on an ineffective assistance of counsel finding is "whether that finding by the district judge was an abuse of discretion." However, a historical review of our decisions shows we have on appeal taken a considerably broader view of the issue.

The two landmark cases on the issue of ineffective assistance of counsel are those considered and utilized by the trial court, *Strickland* and *Chamberlain*.

Justice O'Connor, in writing for a 7 to 2 majority in *Strickland*, stated that before counsel's assistance is determined to be so defective as to require reversal, two components or prongs must be shown:

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial . . . ." 466 U.S. at 687.

Further, the *Strickland* majority opinion states:

"[T]he purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. *Engle v. Isaac*, 456 U.S. 107, 133-134 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' See *Michel v. Louisiana, supra,* at 101. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. See Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U. L. Rev. 299, 343 (1983).

"The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.

"Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or

omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 689-90.

*Strickland* was a federal habeas challenge to a state criminal court determination. In viewing the Court's scope of review, Justice O'Connor concluded:

"Finally, in a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d). Ineffectiveness is not a question of 'basic, primary, or historical fac[t].' *Townsend v. Sain*, 372 U.S. 293, 309, n. 6 (1963). Rather, like the question whether multiple representation in a particular case gave rise to a conflict of interest, it is a mixed question of law and fact. See *Cuyler v. Sullivan*, 446 U.S., at 342. Although state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254(d), and although district court findings are subject to the clearly erroneous standard of Federal Rule of Civil Procedure 52(a), both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." 466 U.S. at 698.

Although the clear direction of *Strickland* that "both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact" did not find its way into *Chamberlain*, our seminal Kansas case on this issue, the heart and purpose of the *Strickland* ruling did, and it has been uniformly applied to every Kansas ineffective assistance of counsel case since it was filed in 1985.

In writing for the Kansas Supreme Court in *Chamberlain*, Justice Holmes set forth the existing Kansas standards of *Schoonover v. State*, 2 Kan. App. 2d 481, Syl. ¶¶ 2, 3, 4, 582 P.2d 292, *rev. denied* 225 Kan. 845 (1978), and the claim of "actual ineffectiveness" of *Strickland*. Justice Holmes then stated:

"Comparing *Strickland v. Washington* with the *Schoonover v. State* standards of ineffective assistance of counsel reveals little conflict between the two. Where *Schoonover* required proof of counsel's conduct substantially deviating from that expected of a reasonably competent lawyer in the community, *Washington* requires proof the conduct was not reasonable considering all the circumstances,

with defendant required to overcome a strong presumption of reasonableness. *Schoonover* also required proof counsel's conduct caused the client's conviction or otherwise worked to the client's 'substantial disadvantage.' " *Washington* now requires a defendant establish a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. While the actual application of the standards from *Schoonover* as opposed to those of *Washington* would in all probability effect the same result in any given case, we deem it appropriate to now adopt the *Washington* holdings as the prevailing yardstick to be used in measuring the effectiveness of counsel under the Sixth Amendment. They may be stated as:

*First.* The Sixth Amendment right to counsel is the right to the effective assistance of counsel, and the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

*Second:* A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.

(a) The proper standard for judging attorney performance is that of reasonably effective assistance, considering all the circumstances. When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.

(b) With regard to the required showing of prejudice, the proper standard requires the defendant to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.

In adopting the *Washington* two-pronged standard or test we do not abandon the standards which have been carefully developed in *Schoonover* and its progeny. While the Supreme Court in *Washington* refrained from adopting any 'mechanical rules' to be utilized in considering a claim of ineffective assistance of counsel we are of the opinion that our standards enunciated in *Schoonover* and built upon in subsequent cases remain viable guidelines in the application of the *Washington* standard." *Chamberlain*, 236 Kan. at 656-57.

In addition, *Chamberlain* requires the trial court to assess the performance of counsel before an appellate court considers the

matter and stated: "Much deference and reliance must be placed upon the wisdom and determination of the trial judge who saw all of the proceedings first hand as they happened." 236 Kan. at 659-60.

It is apparent from an examination of our appellate decisions on ineffective assistance of counsel issues that Kansas courts have uniformly followed the mandates of *Schoonover, Strickland,* and *Chamberlain* in applying the two-pronged test of *Strickland,* making the independent evaluation of each situation by the totality of the representation as directed in *Schoonover,* requiring the assessment of the performance of counsel by the trial court before it will be considered by the appellate court, and then allowing "deference and reliance . . . upon the wisdom and determination of the trial judge who saw all the proceedings firsthand as they happened" as directed by *Chamberlain.* Although we may not have uniformly stated in our appellate opinions that we have given a de novo review to the mixed questions of fact and law which exist, it is apparent that we have done so.

We hold that once a proper determination of the issue of ineffective assistance of counsel has been made by the trial court, see *State v. Miller,* 259 Kan. 478, 486-87, 912 P.2d 722 (1996); *State v. Hall,* 246 Kan. 728, 753, 793 P.2d 737 (1990); and *State v. Van Cleave,* 239 Kan. 117, 119, 716 P.2d 580 (1986), we review the issue on appeal de novo as directed by *Strickland* as mixed questions of fact and law under the totality of the facts and circumstances. Our isolated statement in *Taylor,* 251 Kan. at 285, that the appropriate scope of review is abuse of discretion, is disapproved.

Such a holding is consistent with the myriad of cases from the 10th Circuit Court of Appeals which have uniformly so held. See, *e.g., Nickel v. Hannigan,* 97 F.3d 403, 408 (10th Cir. 1996) ("This court reviews de novo the district court's ineffective assistance of counsel analysis, which involves mixed questions of law and of fact."); *Banks v. Reynolds,* 54 F.3d 1508, 1515 (10th Cir. 1995) ("The performance and prejudice components of the *Strickland* analysis present mixed questions of law and fact which we review de novo."); *Brecheen v. Reynolds,* 41 F.3d 1343, 1365-66 (10th Cir. 1994) (" '[T]he performance and prejudice prongs under *Strick-*

*land* involve mixed questions of law and fact which we review de novo.' ") (quoting *United States v. Owens*, 882 F.2d 1493, 1501-02 n.16 [10th Cir. 1989], which cited *Strickland*, 466 U.S. at 698).

The rule in Kansas which restricts the admission of a defendant's prior convictions for impeachment purposes is clearly stated in K.S.A. 60-421:

"Evidence of the conviction of a witness for a crime not involving dishonesty or false statement shall be inadmissible for the purpose of impairing his or her credibility. If the witness be the accused in a criminal proceeding, no evidence of his or her conviction of a crime shall be admissible for the sole purpose of impairing his or her credibility unless the witness has first introduced evidence admissible solely for the purpose of supporting his or her credibility."

Judge Spencer A. Gard, in commenting on this section, stated:

"*In the criminal case* this section has special application where the defendant testifies in his own behalf. Under the former rule he laid his past record open for inquiry when he became a witness, with the result that the defendant hardly dared to take the stand because of the risk that he would be convicted, not on the evidence bearing on his guilt or innocence, but upon the fact that he was shown to have been a bad actor in the past. By not testifying the defendant did not have the benefit of his own denial of guilt and neither did the state have the benefit of the right to cross examine him on the merits of the case. The policy of the new rule is that it is better to remove the fear of conviction on past record by imposing the restriction that evidence of former conviction cannot be received except in answer to evidence which the defendant introduces to support his character. This puts former conviction evidence on the same basis as testimony of bad reputation.

"While this section uses language about as plain as any language available, it has not been without some inherent uncertainty as to meaning. In the case of Tucker v Lower, 200 K 1, 434 P2d 320, which is a most important and logical decision, the Supreme Court has construed the section to mean (1) that evidence of any crime, whether a felony or misdemeanor, is admissible for impeachment purposes if it is a crime involving 'dishonesty or false statement,' (2) that the crimes of larceny and receiving stolen property are crimes involving dishonesty, and (3) such crimes as drunkenness, reckless driving, allowing an unauthorized person to drive and have an open bottle in the car, are considered merely mala prohibita and do not involve dishonesty or false statement, not because they are misdemeanors, but because they do not fall in the dishonest category. The decision is important also for its review of more traditional rules in other states where the evidence of previous conviction depends on whether the crime is 'infamous' or involves 'moral turpitude,' or whether it is a felony, regardless of its character." 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-421 (1979).

K.S.A. 60-421 has been the law in Kansas since January 1, 1964, and is a basic provision of our law of evidence of which any attorney who practices in our courts should be aware.

Additionally, K.S.A. 60-455 restricts the admissibility of prior crimes in that it provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

The trial court found that Bunch advised Rice not to testify because Bunch was unfamiliar with the Kansas law, primarily the provisions of K.S.A. 60-421. It was further found that based on this erroneous advice, Rice decided not to testify on his own behalf.

However, in answering the question of whether Bunch's performance was unreasonably deficient, the trial court stated:

"Throughout the trial, defendant had the aid of well prepared, able and effective counsel. Trial counsel's performance was thoughtful and professional. He fully understood the state's case and effectively cross-examined the state's witnesses. His preparation of the defendant's case was similarly thoughtful and professional. The error to which he now confesses is serious but it is not sufficient for this Court to say his performance was unreasonably deficient."

The trial judge went on to state:

"Having reached this conclusion, it is not necessary to address the [second] test. However, it should be clear that the Court's answer to that question would also be 'No.' "

Because of our previously stated scope of review, we now consider these mixed questions of facts and law de novo.

There is limited Kansas precedent on this precise question, although two cases deserve mention.

In *State v. Logan*, 236 Kan. 79, 689 P.2d 778 (1984), the defendant was charged with and convicted of the sale of methamphetamine. His attorney, operating under a misunderstanding of the law by believing the State would be able to bring out prior convictions involving dishonesty upon cross-examination, disclosed prior

convictions for felony burglary and robbery. Counsel was attempting to "lessen the sting" to the jury and enhance Logan's credibility. 236 Kan. at 83.

We found the defendant's credibility was damaged by his counsel's advice and the questioning was not the result of a reasonable trial strategy. However, a new trial was not granted, in part because counsel's conduct was gauged by the totality of the circumstances:

"He was well prepared, lodged numerous objections to evidence, and argued thoroughly his motion for a directed verdict and a motion in limine. Counsel's misunderstanding of the law concerning defendant's prior convictions and the circumstances under which the defendant could plead the Fifth Amendment were his only apparent errors. Additionally, it is not apparent the defendant would have been acquitted in the absence of his counsel's error, since the jurors may have chosen to believe the State's version of the events even if defendant's credibility had not been shaken." 236 Kan. at 83-84.

The *Logan* court recognized that *Strickland* had been recently decided but did not apply any of its reasoning or analysis.

In response to a question concerning *Logan* at oral argument, Rice's appellate counsel stated that at least defendant Logan was able to present his testimony to the jury, while Rice was prevented from exercising this basic constitutional right.

A comparable situation was present in *State v. Wright*, 203, Kan. 54, 453 P.2d 1 (1969). Wright was on trial for rape. His attorney with 35 years of experience was unaware of K.S.A. 60-421, which would have prevented the State from questioning the defendant as to his prior convictions. Wright's counsel questioned him as to his prior convictions, leaving out an earlier rape offense which was then brought out on cross-examination.

The trial court instructed the jury not to consider any evidence of the defendant's prior record in reaching its decision. Our court determined the error by counsel was not prejudicial to the defendant.

The majority in *Wright* characterized defense counsel's interjection of his client's prior record as his "only slip" but that "[i]n all other respects counsel showed unusual diligence and ability." 203 Kan. at 56. Only Justice Fontron dissented, and in his usual

descriptive language, characterized defense counsel's action as a "continuing and poisonous 'slip.' " 203 Kan. at 61.

In both *Logan* and *Wright*, the accused testified, although his criminal background was exposed beyond what was required. In neither case was this deemed to be ineffective assistance of counsel.

The only similarity between *Logan* and *Wright* and Rice's situation appears to be representation by counsel with a basic lack of understanding of our rules of evidence. It might be argued Rice was left in a better position than either Logan or Wright, for at least his criminal record was never presented to the jury.

There are so many other Kansas cases, as well as those from other states and the federal courts, where claims of ineffective assistance of counsel have been raised that it would be counterproductive to attempt any case-by-case analysis other than to say each instance is highly fact driven. Appellate judges in making a de novo review of the mixed questions of law and fact should well remember the admonishment of *Chamberlain* that "deference and reliance must be placed upon the wisdom and determination of the trial judge who saw all the proceedings first hand as they happened." 236 Kan. at 659-60.

It appears from the record, and Bunch stated so affirmatively at the ineffective assistance of counsel hearing, that the primary trial strategy of the defense in this case was that Lindy was alive. Four witnesses directly testified to this. Witnesses were also presented to mitigate the State's theory that Rice was a violent man. In response to the State's question, "So you were not only there to create reasonable doubt, you were there to prove he was innocent?", Bunch answered, "Yes."

It was further shown that the majority of the evidence Rice would have presented was in fact made available to the jury through the testimony of a reporter who interviewed him and wrote an article for the Kansas City Star. All of these factors may weigh more heavily on a proper determination of the second prong of the *Strickland* test, but the fact remains that Bunch's assistance on what he admits is a crucial decision in every criminal jury trial—

whether the accused should take the stand and testify—was un-reasonably deficient.

The advice that Rice should not testify was not based on any justifiable strategic considerations but rather on the belief that had he done so, his previous convictions would have been laid open to the jury. Attempting to practice law in a jurisdiction where one is not licensed without having a correct understanding of one of the critical components of the decision of whether the accused should testify is inexcusable.

This deficiency is further amplified by the lead counsel's failure to question local counsel about the issue. Our dismay is not only limited to the actions of out-of-state counsel, but also to Kansas counsel who undertook local representation but did not ensure that he was actually involved in all aspects of defending an accused charged with first-degree murder and facing the most severe penalty available under our State's law. His conduct is also equally appalling.

We hold Rice has satisfied the first portion of the ineffective assistance of counsel test: counsel's performance was unreasonably deficient. The trial court erred in ruling otherwise.

We are not, however, convinced the trial court erred in stating that the deficient performance did not prejudice the defense so as to deprive the defendant of a fair trial. Although the trial judge said it was not necessary to reach the second prong of the *Chamberlain* test, it is clear from his comments that he ruled that not only was the representation not ineffective, but also "the Court's answer to that question would also be 'No.' "

To satisfy the second prong of *Chamberlain*, it is required that the defendant show

"that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.

. . . .

"(b) With regard to the required showing of prejudice, the proper standard requires the defendant to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." 236 Kan. 650, Syl. ¶ 3.

At this point, the discussion previously set forth as to the strategy of Rice's defense is actually more applicable to a discussion of the second-prong than it was to the first question of whether the counsel's performance was deficient. The trial strategy that Lindy was and is alive was not hindered by the lack of Rice's testimony. Had Rice testified, there does not appear to be any evidence he could have offered to substantiate the testimony of the four witnesses who stated they had seen Lindy alive subsequent to September 15, 1992. This testimony was clearly not believed by the jury. It is doubtful Rice's testimony would have changed its decision. This factor weighs heavily in justifying the trial court's decision.

Additionally, Rice's silence did not have any effect on the defense strategy of showing him as a nonviolent person.

The testimony Rice stated he would have offered would not have countered the devastating effect, if believed, of the testimony of Pam Whitten that Rice's sister, Dixie Frazier had seen Lindy the morning of September 15, 1992, and that she had checked for Lindy's pulse and put a mirror to her face, but had found no signs of life. Additionally, Frazier supposedly told Whitten that later that day, Rice dropped the children off at her house to be watched so he could dispose of the body and clean the house. This evidence had to be judged by the jury solely on the respective credibility of Whitten and Frazier.

The testimony of the children was effectively cross-examined and challenged, and while Rice may have amplified the inconsistencies, much of that same evidence came in through the news story.

We were not present, as the trial judge was, to see all the witnesses or to view Rice's actions during the trial and to gauge the effect of the one outburst that was testified to during the ineffective assistance hearing. We give the trial court's finding deference to which it is entitled, but reach our decision de novo based on the mixed questions of law and fact the entire record places before us.

It is apparent the trial judge was not limited to the evidence presented at the ineffective assistance hearing, but took into consideration, as we must do, the totality of the evidence before the

jury. There is considerable evidence sufficient to uphold the verdict which would not have been affected by Rice's testimony.

We are not convinced that Rice has shown that had he testified, there is a reasonable probability that the result of the proceeding would have been different. We uphold the trial court's ruling that Rice was not deprived of a fair trial. Defendant has not satisfied the second prong of the *Strickland/Chamberlain* test.

## Pro se filings

We have examined numerous pro se filings from the defendant: The additional arguments relating to the Whitten testimony have been considered and are fully addressed previously in this opinion. The issue raised concerning the timely filing of the hard 40 notice is considered as required by K.S.A. 1993 Supp. 21-4627 and found to be without merit. The issue contending prosecutorial misconduct in closing argument relating to a statement about Dr. Sayegh and that Lindy Rice deserves a fair trial were not improper and would not justify or require a new trial. The testimony concerning marital discord was proper.

No issue raised in defendant's pro se filings requires a different result than we have reached herein.

Affirmed.

DAVIS, J., dissenting: I respectfully dissent from the majority's opinion and would conclude that the trial court erred in rejecting the defendant's claim for a new trial based on ineffective assistance of counsel.

The majority concludes that counsel's assistance to the defendant was unreasonably deficient. The majority further concludes that counsel's advice to the defendant, that he should not testify, was not based upon any justifiable strategic consideration but was based on the fact that counsel attempted to practice law in a jurisdiction where he was not licensed without having a correct under-. standing of the rules of evidence or making the necessary efforts to learn how Kansas law treats a critical piece of evidence—the testimony of a defendant—in any criminal defense. The majority states that counsel's failure to even question local counsel about

the fundamental precepts of Kansas law when defending an accused charged with first-degree murder and facing the most severe penalty available under law is inexcusable. Finally, the majority concludes that it was shocked with the conduct of Kansas counsel who undertook local representation and failed to fill the requirements of that representation. I agree with these conclusions and with the ultimate conclusion that counsel's performance was unreasonably deficient. However, I disagree with the majority's conclusion that there was not a reasonable probability of a different outcome had the defendant testified.

Three factors are especially important in analyzing the effect of defense attorney Willard Bunch's erroneous and unreasonable advice to his client not to testify. First, the appellate court exercises particularly sensitized review of cases where the conviction is based solely on circumstantial evidence. *State v. Williams*, 229 Kan. 646, 648, 630 P.2d 694 (1981). In this case, the victim's body was never found, nor did any witness testify to seeing the victim killed. Second, an appellate court's review of cases in which a hard 40 sentence is imposed is similarly sensitized. See K.S.A. 1993 Supp. 21-4627. Finally, Bunch's advice prevented the defendant from exercising his constitutional right to testify in his own defense.

The defendant presented witnesses who testified they saw the victim alive after she was supposedly killed. The only evidence that could not be reconciled with the defense theory was the State's rebuttal testimony of Pam Whitten, who was staying at the home of Dixie Frazier, the defendant's sister. This testimony was hearsay evidence denied by the declarant. The defendant actively assailed Whitten's credibility by attempting to establish that she was unstable and possessed a motive for lying because the defendant's sister refused to give her money to leave the state. Either Sami Stern an acquaintance of Frazier, who testified she talked at length with the victim after her alleged death, or Whitten, who testified Frazier discovered the victim was dead, lied to the jury.

In the face of this contradictory testimony, the defendant's testimony could have weakened the other circumstantial evidence against him which tended to corroborate the story told by Whitten. His testimony about the events of the night of September 13, 1992,

could have created serious questions about whether the victim's children, Mark and Amanda Lyons, had combined the events of 2 days into 1 and had actually seen their mother on the bathroom floor the morning before the final fight. The defendant proffered evidence of what his testimony would have been had he taken the stand. At the hearing, the defendant testified that he would have refuted key aspects of the State's case. He would have denied that he killed the victim. The defendant's testimony could have created a reasonable doubt.

While there is evidence in the record that much of what the defendant would have testified to was before the jury in the form of other testimony, this is not the same as the defendant testifying. The defendant's testimony, under all the circumstances, was of critical importance.

The conduct of the defendant's counsel did not merely result in a minor procedural error. Bunch's erroneous understanding of governing law had the effect of preventing the defendant's exercise of his apparent constitutional right to testify in his own defense. See *Nix v. Whiteside*, 475 U.S. 157, 164, 173, 89 L. Ed. 2d 1, 106 S. Ct. 988 (1986). Where a trial error deprives a defendant of a constitutional right, the standard to be applied is more stringent than simply whether there is a reasonable probability of a different result. Instead, the presumption is that the error warrants reversal unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt, that is, that we can say beyond a reasonable doubt that the error had little, if any, likelihood of changing the result of the trial. See *State v. Johnson-Howell*, 255 Kan. 928, 944-45, 881 P.2d 1288 (1994).

There is no question that the defendant's decision not to testify was based solely on counsel's erroneous advice that all of his prior convictions would have then come into evidence. Counsel for the defendant corroborates this fact by his own testimony.

I would conclude that the defendant's claim of ineffective assistance of counsel has more merit than the majority decision finds. While the majority defers to the trial court's findings, it does so after concluding that the trial court erred as a matter of law in not finding Bunch's conduct unreasonably deficient. After making this

determination, the trial court could, and did, base its decision solely on this erroneous legal conclusion and, therefore, may not have considered the question of prejudice. Indeed, the trial court's journal entry reflects no deep reflection on the question: "Having reached this conclusion [counsel's performance was not deficient], it is not necessary to address the record [*sic*] test. However, it should be clear that the Court's answer to that question would also be 'No.'"

The majority opinion presumes by the "record test" the trial court was referring to the question of whether, but for the counsel's error, there would be a reasonable probability of a different result. In light of the trial court's legally erroneous conclusion that Bunch's representation was not unreasonably deficient, I would find this presumption too fine and frayed a thread to support the heaviest punishment our state imposed at the time of the defendant's conviction.

Even under the more onerous standard of *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), these circumstances meet that case's two-prong test. As stated by the majority, counsel's assistance was "unreasonably deficient" and "inexcusable," which satisfies the first prong. With all due respect to the majority of this court, its analysis of the second prong (whether the defendant has shown a reasonable probability that, but for counsel's unprofessional errors, the result would have been different) misses the critical question. "A reasonable probability is a probability sufficient to *undermine confidence* in the outcome." (Emphasis added.) *Chamberlain v. State*, 236 Kan. 650, Syl. ¶ 3, 694 P.2d 468 (1985), applying *Strickland v. Washington.* In this case, I think the ultimate focus should not be based on mechanical rules but rather on the question of fundamental fairness. See *Strickland v. Washington*, 466 U.S. at 697; *Chamberlain v. State*, 236 Kan. at 655.

In my opinion, the majority's emphasis on deference to the trial court's first-hand view of the proceedings deepens the sense of undermined confidence. The trial court, due to counsel's erroneous advice, never had the opportunity to see the defendant testify,

observe his demeanor, or weigh his credibility. In these circumstances, I think confidence is unwarranted.

The United States Supreme Court, in the seminal right to counsel case, *Gideon v. Wainwright*, 372 U.S. 335, 344, 9 L. Ed. 2d 799, 83 S. Ct. 792 (1963), reiterated the "moving words of Mr. Justice Sutherland" in *Powell v. Alabama*, 287 U.S. 45, 77 L. Ed. 158, 53 S. Ct. 55 (1932):

" 'Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.' [Citation omitted.]" 372 U.S. at 345.

The defendant was deprived of the "guiding hand of counsel" regarding his right to testify in his own defense. In the absence of adequate advice, he was in no better position than a defendant deprived of counsel altogether.

Fundamental fairness and confidence in a fair outcome require me to conclude, in accordance with *Chamberlain,* that there remains a reasonable probability that but for counsel's unprofessional error, the results of the proceeding would have been different. In accordance with *Nix v. Whiteside*, I cannot say that counsel's error, which deprived the defendant of his constitutional right to testify in his own defense, was harmless beyond a reasonable doubt. I would, therefore, conclude that this error warrants reversal and would reverse and remand for a new trial.

ALLEGRUCCI and SIX, JJ., join in the foregoing dissent.